598 So.2d 731 (1992)
Susie Ann BALFOUR
v.
STATE of Mississippi.
No. 89-DP-1355.
Supreme Court of Mississippi.
March 25, 1992.
*734 Thomas H. Pearson, Cheryl Ann Webster, Clarksdale, for appellant.
Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
DAN M. LEE, Presiding Justice, for the Court:
This is an appeal by Susie Ann Balfour from the DeSoto County Circuit Court from a conviction of capital murder and a sentence to death by lethal injection. Ms. Balfour appeals her conviction and sentence to this Court alleging that the lower court committed twenty-three (23) errors in the trial of her case. After diligent review of all issues raised by Balfour, we find that the trial court erred in admitting into evidence Balfour's statement of confession which was obtained in violation of her Fifth, Sixth and Fourteenth Amendment rights of the United States Constitution, as well as rights secured by Article III, Section 26 of the Mississippi Constitution of 1890. Consequently, we reverse Balfour's conviction of capital murder, vacate her sentence of death by lethal injection, and remand the same to the DeSoto County Circuit Court for a new trial.
We find that Balfour's first issue alleging violation of her Fifth and Sixth Amendment rights is outcome determinative for the result reached in this case. Therefore, we find little or no benefit in exploring all twenty-three (23) issues; however, we do address other issues which we deem to be necessarily dispositive. Balfour raises the following issues on appeal:
I. The trial court erred in admitting into evidence a confession obtained through interrogation initiated by investigators after defendant had requested counsel.
II. The court erred in admitting into evidence a confession obtained in violation of Rules 1.04 and 1.05.
III. The trial court erred in that during the sentencing proceeding it allowed the State of Mississippi to question the appellant in an improper and speculative manner. The State questioned the appellant concerning future robberies which had not been committed, and, further insinuated that she would have been a willing participant "until caught or someone was killed," all of which was designed to inflame the jury and cause unfair prejudice to the appellant and denied her a fair trial during the sentencing proceeding to determine punishment in capital cases.

IV. The trial court erred in that it allowed the State of Mississippi to question the witness, Lawrence Kirby Payne, during its cross-examination about a certified lab report, and the findings contained therein, which were never offered into evidence during the trial, and of which the State of Mississippi knew this witness had no actual knowledge, knew it had no basis in fact for the questioning, and did so question for the sole purpose of inflaming the jury *735 and denying this appellant her right to a fair trial.

V. The trial court erred in that it allowed the State of Mississippi to question improperly the witness, Lawrence Kirby Payne, with no basis in fact for the questioning whatsoever during the State of Mississippi's cross-examination, all of which was designed to produce irreparable injury to the appellant's defense; and, further, it was designed to inflame the jury thus causing the appellant undue prejudice and denying the appellant a fair trial.
VI. The trial court erred in that it failed to grant a mistrial based on the release of juror Chandler after jury deliberations had begun, and the replacement of her with an alternate juror in violation of the laws of the State of Mississippi.
VII. The trial court erred in that it allowed into evidence any and all statements made by Lt. Lance, the decedent, to Bruce Smith, an emergency medical technician.
VIII. The trial court erred in that it allowed into evidence the testimony of Officer Vick concerning the good character of Lt. Lance, the decedent, without the character of Lt. Lance having first been impugned by the appellant, causing the appellant undue prejudice and denying the appellant a fair trial.
IX. The trial court erred in that it allowed into evidence the testimony of State's witness, Pam Tuten, a jail house snitch, which was not relevant to the issues before the bar and therefore was inadmissible.
X. The trial court erred in that it allowed into evidence the testimony of State's witness, Pam Tuten, even if it was relevant in that the testimony should have been excluded because its probative value was substantially outweighed by the prejudice caused the appellant and therefore denied her a fair trial.
XI. The suppression of evidence favorable to Susie Balfour denied her a fair trial and sentencing hearing.
XII. The jury was not fully instructed on the alternative of manslaughter.

XIII. The refusal to permit the defense to voir dire those jurors eliminated pursuant to Witherspoon v. Illinois and Fuselier v. State violated Susie Balfour's constitutional rights.

XIV. When the accused stated that she wished to proceed to trial without counsel, the trial court was obligated to conduct a full inquiry into her Faretta demand.
XV. The prosecution improperly questioned the accused so as to set up a strawman to use as an excuse to impeach Susie Balfour with her first statement, taken in violation of her Fifth Amendment rights.
XVI. Improper statements made by the prosecutor throughout the trial violated Susie Balfour's right to a fundamentally fair proceeding. Specifically, there was improper questioning of the accused when she testified, improper cross-examination of other witnesses and improper statements generally.

XVII. The instructions at the guilt phase failed to adequately define the law for the lay people *736 who were called to serve as jurors.

XVIII. The instructions at the penalty phase failed to channel the jurors' discretion as required by Furman v. Georgia.
XIX. The invalidity of various aggravating circumstances in this case requires resentencing.
XX. The exclusion of black jurors raised a presumption, which was never rebutted, that racial considerations were playing a part in jury selection.
XXI. By taking no action to control the number of uniformed, armed law enforcement officers who came to encourage a verdict of guilty and a sentence of death, the trial court abdicated its responsibility to guarantee a fair trial.
XXII. The trial judge should not have conducted significant aspects of the proceedings ex parte without the defendant or counsel being present.
XXIII. The indictment failed to adequately charge the crime of capital murder under Mississippi law.
Our opinion today emphasizes issue I, violation of appellant's Fifth and Sixth Amendment rights, while also addressing issues III, IV, V, VI, XIII and XXI. We begin with a recitation of the facts which have brought us thus far.

FACTS
On October 4, 1988, Susie Ann Balfour along with her boyfriend, Lawrence Kirby Payne, embarked on a crime spree throughout Marshall and DeSoto Counties in north Mississippi. Payne and Balfour's criminal adventure came to a tragic halt in the early morning hours of Friday, October 7, 1988, when Balfour shot and killed Lt. Billy Lance, a Southaven police officer, who had stopped Payne and Balfour as they attempted to flee to Memphis after having robbed the Circle K convenience store in Southaven, Mississippi.
Balfour was taken into custody at approximately 7:00 a.m. at the home of Mary Payne, Lawrence Kirby Payne's mother, on October 7, 1988, and she was charged with capital murder. At 9:43 a.m., Balfour met with Investigators Creekmore Wright and Kenny Dickerson. At this meeting, Balfour was presented with a waiver of rights form. Although Balfour placed her initials, "S-B," at the end of each sentence on the rights form, she refused to sign the form and declined the offer to waive any of her Miranda rights. The signature blank on the form was marked, "Refused to Sign".
Balfour remained in the custody of the DeSoto County Sheriff's Office over the following weekend and Monday, October 8, 9, and 10, 1988. On Tuesday morning at 9:00 a.m., October 11, 1988, Balfour had her initial appearance before Judge Mills Barbee. At the initial appearance, Balfour informed the court that she had not retained counsel in the four days since her arrest, but she expressed a belief that a family member was making arrangements for her legal representation. Judge Barbee instructed law enforcement officials who had custody of Balfour to make a telephone available so that Balfour could contact her family to inquire about their progress in retaining counsel. Investigator Jimmy Radford and Deputy Bud Smith were in the courtroom during the initial appearance and heard the exchange between Judge Barbee and Balfour. Therefore, both Radford and Smith knew that Balfour had indicated that she would be obtaining counsel. However, in the early afternoon on October 11, 1988, within four hours of the initial appearance, Deputy Bud Smith retrieved Balfour from her jail cell and brought her to an office where Investigator Radford was waiting. Radford and Smith acknowledge that they initiated the contact with Balfour on the afternoon of Tuesday, October 11, 1988, to question her about the robberies and the murder of Lt. Lance.
*737 Radford testified that he read the waiver of rights form to Balfour, and after reading each item, he asked her if she understood. When Balfour replied that she understood, Radford asked her to place her initials at the end of each sentence, and Balfour complied. At a hearing on Balfour's motion to suppress her statement of confession, Investigator Jimmy Radford described the procedure which he used at the October 11, 1988, interview and Balfour's "nonassertion" of her right to counsel:
Q. Okay. During this administration of rights, what request, if any, did she make for a lawyer?
A. She did not request an attorney. She said her family might have hired her one. I picked up the phone and put it on my desk and offered to let her use the telephone and call her folks or call the attorney. I got the phone book out to let her look up the phone number.
Q. What did she do?
A. She wanted a cigarette. She smoked a cigarette. I asked her if she wanted a Coke. She said she did. I left the office and went next door and got us all a Coke and then came back to the office with a Coke.
Q. If she had requested a lawyer, what would you have done?
A. I'd have let her call her lawyer, whoever she wanted.
Q. I notice that the time on the rights waiver bears two times. What is that? 1:24 and 2:05?
A. The 1:24 is when we first gave her her rights. The 2:05 is when we gave her her rights the second time and started the interview.
Q. If I understand you correctly, you gave her her rights two times?
A. That's correct.
After executing the waiver of rights form, Susie Ann Balfour gave a full confession to the shooting of Lt. Lance and admitted involvement in a string of convenience store robberies committed with her accomplice, Lawrence Kirby Payne, from October 4-7, 1988.
At approximately 3:00 a.m. on Friday, October 7, 1988, Balfour and Payne robbed the Circle K convenience store in Southaven, Mississippi, and then attempted to escape to Memphis when they were stopped by Lt. Lance of the Southaven Police Department. As Lt. Lance attempted to handcuff Lawrence Kirby Payne, Balfour retrieved a .38 calibre pistol and fired one fatal shot at Lt. Lance. Lt. Lance died at a local hospital approximately thirty (30) minutes later.
Balfour's statement was eleven (11) pages in length. According to Investigator Radford, he simply asked Balfour to tell him what happened, and Balfour began talking in narrative form. Radford wrote what Balfour described as she told it. Balfour described the shooting of Lt. Lance as follows:
Got in car Drove off. Told him to take me to Memphis. I was going to my Mother's, Kirby said the police. I looked back and seen the blue lights. Asked Kirby what to do and he said get rid of that stuff. Told him he would see me throw it out. Kirby told me to do what he said. When the car stopped I threw two cans of mace out and the gun. Kirby got out of car and he came back to the car opened the door and said let me get my license and the officer said I don't want to see your license. Kirby had his wallet and he knew the license wasn't in the car. Kirby asked what this was about. Officer said you know what this was about, when Kirby came back to the car he told me to get the gun I got out of the car. Asked the officer what was going on. Told me to get back in the car. Kirby was moving his mouth telling me to get the gun and shoot him. I was shaking my head. Then Kirby said Peaches do what I told you to do the officer unsnapped I guess his gun. I got scared. I got out of the car again. He said Mame I thought I told you to stay in the car. I told him I am not going to cause any problems. Can't we talk this out. I was standing by the trunk not quite all the way around. I had the gun down by my leg. I came to the corner of the car. I leaned on the trunk I raised the gun up and shot just a round. It *738 almost jumped out of my hand. I dropped the gun and got in the front seat on the passenger side put my head down. Heard some shots. I climbed over to the driver's side. I saw Kirby running through the bushes on the right. Some more police was there about three police cars they were facing me looked like they went after Kirby. I drove off... .
Balfour Confession Statement, R. 109-111.
Balfour read her statement after reviewing it. She scratched through a few words and initialed the changes. Then, she initialed each page at the bottom and signed her statement on the last page.
On Friday, October 14, 1988, Balfour made a second appearance before Judge Barbee. Balfour and her family had been unsuccessful in obtaining counsel; therefore, the court appointed an attorney for her on October 14, 1988, one week following her arrest.
In Balfour v. State I, this Court addressed two of Balfour's robbery convictions which stemmed from the October 4-7, 1988, crime spree. This court reversed both convictions and remanded for a new trial finding that Balfour's confession was obtained in violation of her Fifth and Fourteenth Amendment rights. Balfour v. State I, 580 So.2d 1203 (Miss. 1991). The same confession is at issue in this appeal. Consequently, Balfour had two hearings on her Motion to Suppress the confession given on October 11, 1988. One such hearing was held prior to Balfour's trials on two counts of robbery, and the second hearing was held prior to the capital murder trial. There is a significant difference between the two hearings, although both pertained to the same confession. At the suppression hearing prior to the robbery trials, Balfour took the stand and testified about the events of October 7, 1988, immediately following her arrest, as well as the events of October 11, 1988, when Balfour was questioned about the murder and confessed. At the suppression hearing prior to the capital murder trial, Balfour did not testify. However, at the second hearing prior to the capital murder trial, Balfour's attorney moved that the first hearing on her Motion to Suppress be incorporated into the record for this case, and the trial judge granted the motion. Therefore, we approach the issues in this case with the benefit of Balfour's testimony regarding the invocation of her Fifth and Sixth Amendment rights in the same manner as in Balfour v. State I, 580 So.2d 1203 (Miss. 1991).
At the first suppression hearing prior to the robbery trial, Balfour testified that she requested a lawyer on the morning of October 7, 1988, when she met with Creekmore Wright and Kenny Dickerson. According to Balfour, she stated that she was not going to sign any papers or answer any questions without a lawyer present. As we noted in Balfour I, this assertion by Balfour was uncontradicted by the State and was "buttressed" by her refusal to sign a waiver of rights form on October 7, 1988. Balfour I, 580 So.2d at 1208.
When Balfour made her initial appearance four days later on the morning of Tuesday, October 11, 1988, Investigator Radford and Deputy Smith were both present. Both Radford and Smith knew that Balfour had indicated at her initial appearance that she would be obtaining counsel. At the second hearing on the motion to suppress, Radford testified about his understanding of what transpired between Balfour and the judge at her initial appearance.
Q. To the best of your recollection, what was said to her and what was her reply in regard to being represented by an attorney?
A. I believe the judge asked her if she had an attorney, and she said she was going to talk to her family about getting one.
Q. Did you interpret this to mean that she did want an attorney?
A. I didn't interpret it either way.
Q. Did you form an opinion at that time as to whether or not she wanted an attorney?
A. No, sir.
Q. Did her answer indicate that she wanted to see about trying to get an attorney?
A. Yes, sir.

*739 Q. And you knew that that morning, did you not?
A. Yes, sir.
At the conclusion of the suppression hearing prior to the capital murder charge, the trial judge issued a bench ruling denying Balfour's Motion to Suppress.
[T]he Court finds that the State has proven beyond a reasonable doubt based on the evidence of voluntariness of the statement; the Court concludes that the statement of Ms. Balfour was a free and voluntary statement on her part after she knowingly and intelligently gave up her rights as set out in Miranda. Therefore, the motion to suppress will be denied.
Balfour's trial on the capital murder charge commenced on Monday, October 9, 1989. During the State's case-in-chief, Balfour's statement of confession was admitted into evidence. During the defendant's case-in-chief, Balfour took the stand and admitted shooting Lt. Lance, and her testimony was consistent with her confession. Balfour's trial strategy was to secure a conviction for manslaughter by alleging that she shot Lt. Lance in a panicked state of mind without the requisite intent to kill. However, the jury rejected Balfour's defense and returned a verdict of guilty of capital murder. A separate sentencing trial was held with the jury sentencing Balfour to death by lethal injection.

Death Penalty Standard of Review
This Court's standard of review on an appeal for conviction of capital murder and sentence of death was explained in Williamson v. State, 512 So.2d 868, 872 (Miss. 1987):
On appeal to this Court convictions of capital murder and sentences of death must be subjected to what has been labeled `heightened scrutiny.' Smith v. State, 499 So.2d 750, 756 (Miss. 1986); West v. State, 485 So.2d 681, 685 (Miss. 1985). Under this method of review, all bona fide doubts are to be resolved in favor of the accused because `what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.' Irving v. State, 361 So.2d 1360, 1363 (Miss. 1978); see also, Fisher v. State, 481 So.2d 203, 211 (Miss. 1985) (quoting Irving). With these principles as our guide, we now proceed to review the various propositions presented to us by the defendant.
Williamson, 512 So.2d at 872.

A. The trial court erred in admitting into evidence a confession obtained through interrogation initiated by investigators after defendant had requested counsel.

October 7, 1988/October 11, 1988 Invocation of Fifth or Sixth Amendment Right?
The United States Supreme Court recently addressed the distinction between the Fifth and Sixth Amendment right to counsel in the case of McNeil v. Wisconsin, 501 U.S. ___, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).
Paul McNeil was arrested in Omaha, Nebraska, on a warrant charging him with an armed robbery in West Allis, Wisconsin. Soon after his arrest, two sheriff's deputies from Wisconsin sought to question McNeil and advised him of his Miranda rights. McNeil v. Wisconsin, 501 U.S. ___, ___, 111 S.Ct. 2204, 2206, 115 L.Ed.2d 158, 165 (1991). McNeil refused to answer any questions, but he did not request counsel. The deputies promptly ended the interview. McNeil had his initial appearance in Wisconsin on the armed robbery charge and was represented by a public defender. McNeil, 501 U.S. at ___, 111 S.Ct. at 2206, 115 L.Ed.2d at 165.
On the evening of his initial appearance, McNeil was visited by a detective who was investigating a murder, attempted murder, and an armed burglary in Caledonia, Wisconsin, in which McNeil was a suspect. McNeil, 501 U.S. at ___, 111 S.Ct. at 2206, 115 L.Ed.2d at 165. The detective advised McNeil of his Miranda rights, and on this occasion McNeil signed a waiver form. McNeil indicated that he knew of the Caledonia crimes, but he denied any involvement. Two days later, the detective returned. The detective again advised McNeil of his Miranda rights, which *740 McNeil waived. This time, McNeil admitted that he was involved in the Caledonia crimes, and he implicated two other men, Willie Pope and Lloyd Crowley. Another two days passed, and the detective returned after being convinced that McNeil wrongfully implicated Pope. The interview began with Miranda warnings; and, once again, McNeil signed a waiver form. On the next day, McNeil was charged with the Caledonia crimes. McNeil's motion to suppress the three incriminating statements was denied, and he was eventually convicted and sentenced to sixty (60) years for the Caledonia crimes. McNeil, 501 U.S. at ___, 111 S.Ct. at 2207, 115 L.Ed.2d at 166.
In a nutshell, McNeil argued that his initial courtroom appearance with an attorney for the West Allis armed robbery constituted an invocation of his Fifth Amendment Miranda right to counsel, thereby making invalid his three subsequent waivers of that right from police-initiated questioning pertaining to the Caledonia crimes. McNeil v. Wisconsin, 501 U.S. ___, ___, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158, 166 (1991). The Court noted that when McNeil provided the incriminating statements of the Caledonia crimes, his Sixth Amendment right to counsel, with respect to the West Allis armed robbery, had been invoked when he made his initial courtroom appearance with an attorney. However, the United States Supreme Court rejected McNeil's argument that invocation of his Sixth Amendment right to counsel on the West Allis charge extended to an invocation of his Fifth Amendment Miranda right to counsel on the Caledonia crimes. McNeil, 501 U.S. at ___, 111 S.Ct. at 2208, 115 L.Ed.2d at 168. The U.S. Supreme Court noted that the Sixth Amendment right is "offense-specific."
The Sixth Amendment right, however, is offense-specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, "`at or after the initiation of adversary judicial criminal proceedings  whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" United States v. Gouveia, 467 U.S. 180, 188 [104 S.Ct. 2292, 2297, 81 L.Ed.2d 146] (1984) (quoting Kirby v. Illinois, 406 U.S. 682, 689 [92 S.Ct. 1877, 1882, 32 L.Ed.2d 411] (1972) (plurality opinion)). And just as the right is offense-specific, so also its Michigan v. Jackson effect of invalidating subsequent waivers in police-initiated interviews is offense-specific.
McNeil v. Wisconsin, 501 U.S. ___, ___, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158, 166-67 (1991).
"Because petitioner provided the statements at issue here before his Sixth Amendment right to counsel with respect to the Caledonia offenses had been (or even could have been) invoked, that right poses no bar to the admission of the statements in this case." McNeil v. Wisconsin, 501 U.S. ___, ___, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158, 167 (1991).
In contrast with the Sixth Amendment right, once an accused invokes a Miranda Fifth Amendment right to counsel regarding one offense, "he may not be reapproached regarding any offense unless counsel is present. Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988)." McNeil v. Wisconsin, 501 U.S. ___, ___, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158, 168 (1991). The McNeil Court explained the distinction between the Fifth and Sixth Amendment right to counsel:
The purpose of the Sixth Amendment counsel guarantee  and hence the purpose of invoking it  is to "protec[t] the unaided layman at critical confrontations" with his "expert adversary," the government, after "the adverse positions of government and defendant have solidified" with respect to a particular alleged crime. Gouveia, 467 U.S., at 189 [104 S.Ct., at 2298]. The purpose of the Miranda-Edwards guarantee, on the other hand  and hence the purpose of invoking it  is to protect a quite different interest: the suspect's "desire to deal with the police only through counsel," Edwards [v. Arizona], 451 U.S. [477], at 484 [101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981)]. This is in one respect narrower than the interest protected by the Sixth Amendment guarantee (because it relates only *741 to custodial interrogation) and in another respect broader (because it relates to interrogation regarding any suspected crime and attaches whether or not the "adversarial relationship" produced by a pending prosecution has yet arisen). To invoke the Sixth Amendment interest is, as a matter of fact, not to invoke the Miranda-Edwards interest. One might be quite willing to speak to the police without counsel present concerning many matters, but not the matter under prosecution. It can be said, perhaps, that it is likely that one who has asked for counsel's assistance in defending against a prosecution would want counsel present for all custodial interrogation, even interrogation unrelated to the charge. That is not necessarily true, since suspects often believe that they can avoid the laying of charges by demonstrating an assurance of innocence through frank and unassisted answers to questions. But even if it were true, the likelihood that a suspect would wish counsel to be present is not the test for applicability of Edwards. The rule of that case applies only when the suspect "ha[s] expressed" his wish for the particular sort of lawyerly assistance that is the subject of Miranda. Edwards, supra, at 484 [101 S.Ct., at 1884] (emphasis added). It requires, at a minimum, some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police. Requesting the assistance of an attorney at a bail hearing does not bear that construction.
McNeil v. Wisconsin, 501 U.S. ___, ___, 111 S.Ct. 2204, 2208-09, 115 L.Ed.2d 158, 168-69 (1991).
Clearly, McNeil reinforced that there is no equivalence between invocation of the Sixth Amendment right of counsel and the invocation of the Fifth Amendment right of counsel derived from Miranda. McNeil v. Wisconsin, 501 U.S. ___, ___, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158, 169 (1991) (citing Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)). See Willie v. State, 585 So.2d 660, 666 (Miss. 1991).
McNeil is instructive for the case at bar for the following reason. Simply put, McNeil helps us to understand which constitutional right Balfour invoked, and when. As McNeil emphasizes, requesting assistance of counsel at an initial appearance or bail hearing to defend the pending charge is not the same type of invocation of counsel contemplated by the Fifth Amendment Miranda-Edwards interest against compulsory self-incrimination, which is associated with police-initiated custodial interrogations. McNeil v. Wisconsin, 501 U.S. ___, ___, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158, 168 (1991); Willie v. State, 585 So.2d 660, 666 (Miss. 1991). In order to invoke the Fifth Amendment right against compulsory self-incrimination, i.e., what McNeil describes as the Miranda-Edwards interest, then some "expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police," is required. McNeil v. Wisconsin, 501 U.S. ___, ___, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158, 169 (1991). Therefore, in order to find a Fifth Amendment violation, we look for some expression by Balfour indicating her desire to have counsel present at custodial interrogations. Balfour made the "requisite expression" at the time of her arrest on October 7, 1988, when Investigators Creekmore Wright and Kenny Dickerson attempted to question her. Balfour asked for an attorney at that time and stated that she was not going to sign any papers or answer any questions without having a lawyer present. See Balfour v. State I, 580 So.2d 1203, 1208 (Miss. 1991).
It seems equally clear that on the morning of October 11, 1988, when Balfour made her initial appearance, it was her Sixth Amendment right which she invoked at that time. This becomes apparent from a review of the record of the initial appearance on Balfour's capital murder charge. The initial appearance on October 11, 1988, related only to the capital murder charge and not the robbery charges. In response to questions from Judge Barbee, Balfour indicated a desire for representation and an *742 interest to contact her family to ascertain their progress in hiring a lawyer for her.
As this Court observed in Balfour I, Susie Balfour invoked her right to counsel on two occasions:
Balfour requested counsel on at least two occasions, the first time being when she was arrested on October 7, when two patrolmen questioned her. In her testimony, which was not refuted, Balfour stated she asked for an attorney. The bright-line rule of Minnick [v. Mississippi, ___ U.S. ___, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990)] warns that once the right to counsel is invoked, all questioning at the initiation of the State must cease. Id. At the time of arrest, she refused to either sign a "Waiver of Rights" form or give a statement.
Four days later, she made her initial appearance in the DeSoto County Court. At that hearing, she again invoked her right to counsel. She advised the judge that she wanted an attorney.
Balfour v. State I, 580 So.2d 1203, 1208 (Miss. 1991).
As we consider the constitutionality of Balfour's confession under Fifth and Sixth Amendment standards, we do so against the backdrop of our scope of review. Determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence. Willie v. State, 585 So.2d 660, 665 (Miss. 1991); Berry v. State, 575 So.2d 1, 4 (Miss. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2042, 114 L.Ed.2d 126 (1991).

THE SIXTH AMENDMENT RIGHT
Once an accused has asserted the right to counsel at arraignment or a similar proceeding, the police may not initiate interrogation. If the police initiate interrogation after the right has been asserted, any waiver by the defendant for that interrogation is invalid. Michigan v. Jackson, 475 U.S. 625, 636, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631, 642 (1986). "[A]fter the Sixth Amendment right to counsel attaches and is invoked, any statements obtained from the accused during subsequent police-initiated custodial questioning regarding the charge at issue (even if the accused purports to waive his rights) are inadmissible." McNeil v. Wisconsin, 501 U.S. ___, ___, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158, 169 (1991). In Michigan v. Jackson, the U.S. Supreme Court explained that the need for a strict prophylactic rule in the Sixth Amendment context was just as compelling as the need in Fifth Amendment instances:
In Edwards, however, we rejected the notion that, after a suspect's request for counsel, advice of rights and acquiescence in police-initiated questioning could establish a valid waiver. 451 U.S., at 484, 101 S.Ct., at 1884. We find no warrant for a different view under a Sixth Amendment analysis. Indeed, our rejection of the comparable argument in Edwards was based, in part, on our review of earlier Sixth Amendment cases. Just as written waivers are insufficient to justify police-initiated interrogations after the request for counsel in a Fifth Amendment analysis, so too they are insufficient to justify police-initiated interrogations after the request for counsel in a Sixth Amendment analysis.

Edwards is grounded in the understanding that "the assertion of the right to counsel [is] a significant event," 451 U.S., at 485, 101 S.Ct., at 1885, and that "additional safeguards are necessary when the accused asks for counsel." Id., at 484, 101 S.Ct., at 1884. We concluded that the assertion is no less significant, and the need for additional safeguards no less clear, when the request for counsel is made at an arraignment and when the basis for the claim is the Sixth Amendment. We thus hold that, if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid.
Michigan v. Jackson, 475 U.S. 625, 635-36, 106 S.Ct. 1404, 1410-11, 89 L.Ed.2d 631, 641-42 (1986).
*743 In Mississippi, the right to counsel attaches, "once the accused is in custody (a fact generating the legal conclusion that the individual is under arrest) and all reasonable security measures (of evidence and persons) have been completed." Nicholson v. State, 523 So.2d 68, 76 (Miss. 1988) (Robertson, J., concurring). See Jimpson v. State, 532 So.2d 985, 988 (Miss. 1988) (right to counsel attaches after arrest and at point in time when initial appearance "ought to have been held"); May v. State, 524 So.2d 957, 967 (Miss. 1988) (same); see also Unif.Crim.R. of Cir.Ct.Prac. 1.02 (Once arrested, accused shall be taken "forthwith" before a magistrate); 1.04 ("Every arrested person shall be taken before a judicial officer "without unnecessary delay"; at initial appearance, judicial officer "shall" inform defendant of right of counsel); 1.05 ("Counsel shall be appointed no later than the time of initial appearance... ."). By comparison, federal courts hold that the Sixth Amendment right of counsel attaches after the initiation of adversary criminal judicial proceedings whether by way of formal charge, preliminary hearing, indictment or information or arraignment. Williamson v. State, 512 So.2d 868, 875 (Miss. 1987) (citing Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); Moore v. Illinois, 434 U.S. 220, 226-27, 98 S.Ct. 458, 463-64, 54 L.Ed.2d 424, 432 (1977)). Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).
Regarding invocation of the Sixth Amendment right, federal constitutional jurisprudence demands that we give "broad, rather than a narrow," interpretation to a defendant's request for counsel "at every critical stage of prosecution." Michigan v. Jackson, 475 U.S. 625, 633, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631, 640 (1986). The requirement of "broad interpretation" of requests for counsel is merely the necessary and logical corollary to the rule that courts "indulge every reasonable presumption against waiver of fundamental constitutional rights." Michigan v. Jackson, 475 U.S. 625, 633, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631, 640 (1986) (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938)).
Susie Ann Balfour invoked her Sixth Amendment right to counsel and the state counterpart right secured by Art. III, § 26 of the Mississippi Constitution at her initial appearance held on Tuesday morning, October 11, 1988. By this time, Balfour had been under arrest for capital murder and in custody for the four (4) previous days (October 7, a.m.  October 11, a.m.). Clearly, Balfour's Art. III, § 26 right had attached at this point, Nicholson v. State, 523 So.2d 68, 76 (Miss. 1988), as well as the Sixth Amendment right with the initiation of criminal judicial proceedings by way of formal charge. McNeil v. Wisconsin, 501 U.S. ___, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986).
At Balfour's initial appearance on the morning of October 11, 1988, the following exchange occurred between Balfour and Judge Barbee:
THE COURT: ... Ms. Balfour, you have been in custody since on or about October the 7th. Have you talked to your family or anybody that is going to help you with regard to hiring a lawyer?
DEFENDANT BALFOUR: They let me try for someone one time. They ain't let me get no phone call.
* * * * * *
THE COURT: Do you want the opportunity to try to talk to a lawyer and try to hire one yourself? We have some public defenders in this County and we assign them on a rotating basis, and after you have attempted to hire an attorney if you want the Court to appoint a lawyer for you I will do that. But since you haven't yet talked to a lawyer or talked to anybody about hiring a lawyer for you  you have to at least make an attempt.
(Addressing Investigators and Deputies.) Now, will ya'll let her make a phone call to her family today or this afternoon and see if she can get her family to help her hire a lawyer?

*744 INVESTIGATOR AND DEPUTIES: Yes, sir.
THE COURT: Will you be calling your mother?
DEFENDANT BALFOUR: Uh-huh.
Keeping in mind that the invocation of the right to counsel is to be afforded a broad interpretation, Michigan v. Jackson, 475 U.S. 625, 633, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631, 640 (1986), Balfour, along with a little help from the court, invoked her Sixth Amendment and Art. III, § 26, right at this time. See Balfour v. State I, 580 So.2d 1203, 1208 (Miss. 1991) (right to counsel invoked at initial appearance). Even if Investigator Radford and Deputy Smith had not been present at the initial appearance and heard the exchange between Balfour and Judge Barbee, knowledge of the invocation would be imputed to them. "One set of state actors (the police) may not claim ignorance of defendants' unequivocal request for counsel to another state actor (the court)." Michigan v. Jackson, 475 U.S. 625, 634, 106 S.Ct. 1404, 1410, 89 L.Ed.2d 631, 641 (1986). Within less than four hours, Radford and Smith initiated contact with Balfour. As a result of this contact, Balfour "waived her rights" and made a full confession to the shooting of Lt. Lance. However, the rigid prophylactic rule of Michigan v. Jackson, and very recently re-endorsed in McNeil v. Wisconsin, absolutely precludes the State from the opportunity to prove a police-initiated valid waiver of that right. See McNeil v. Wisconsin, 501 U.S. ___, ___, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158, 169 (1991) (once right has been invoked, any waiver which is product of police-initiated interrogation is invalid); Michigan v. Jackson, 475 U.S. 625, 635-36, 106 S.Ct. 1404, 1410-11, 89 L.Ed.2d 631, 641 (1986) (same). It follows, then, that it was error for the trial court to admit into evidence Balfour's confession statement of October 11, 1988, since such statement was tainted by the constitutional violation of her Sixth Amendment right to counsel and rights secured by Art. III, § 26, of the Mississippi Constitution of 1890.

THE FIFTH AMENDMENT RIGHT
It is fundamental that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Fifth and Fourteenth Amendment prohibition against self-incrimination requires that custodial interrogation be preceded by advising the defendant that he has the right to remain silent and the right to the presence of an attorney. Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966). See Unif.Crim.R. of Cir.Ct.Prac. 1.03. If the subject indicates that he wishes to remain silent, then the questioning must stop; and if he requests counsel, the questioning must stop until an attorney is present. Miranda v. Arizona, 384 U.S. 436, 474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694, 723 (1966); See Reuben v. State, 517 So.2d 1383, 1388 (Miss. 1987) (interrogation must cease until attorney is present if individual states that he wants attorney, quoting Miranda, 384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723.).
When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by proving that the accused responded to further police-initiated interrogation, even if he has been advised or re-advised of his rights. See Edwards v. Arizona, 451 U.S. 477, 484, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378, 386 (1981); Davis v. Puckett, 857 F.2d 1035, 1037 (5th Cir.1988) (once right is invoked, valid waiver cannot be established to further police-initiated questioning even if subject has been re-advised of Miranda rights, citing Edwards v. Arizona, 451 U.S. 477, 484, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378, 386 (1980)); see also Balfour v. State I, 580 So.2d 1203, 1209 (Miss. 1991) (same). Furthermore, when an accused has expressed a desire to deal with the police only through counsel, further interrogation is absolutely barred until counsel has been made available to him, unless the accused himself initiates further communication. Edwards v. Arizona, 451 U.S. 477, 484, 101 *745 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378, 386 (1981).
Recently, the Supreme Court explained the "bright line" rule of Edwards as follows:
In our view, a fair reading of Edwards and subsequent cases demonstrates that we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning. Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.
Minnick v. Mississippi, 498 U.S. ___, ___ 111 S.Ct. 486, 491, 112 L.Ed.2d 489, 498 (1990).
The Edwards rule assures that statements which might be made in a subsequent interrogation are not the product of badgering or coercive pressure. Minnick v. Mississippi, 498 U.S. ___, ___, 111 S.Ct. 486, 491, 112 L.Ed.2d 489, 496 (1990) (citing Michigan v. Harvey, 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293, 302 (1990); Smith v. Illinois, 469 U.S. 91, 98, 105 S.Ct. 490, 494, 83 L.Ed.2d 488, 495 (1984)). Further, "Edwards conserves judicial resources which would otherwise be expended in making difficult determinations of voluntariness, and implements the protections of Miranda in practical and straightforward terms." Minnick v. Mississippi, 498 U.S. ___, ___ 111 S.Ct. 486, 489-90, 112 L.Ed.2d 489, 496 (1990).
In Smith v. Illinois, the accused initially requested counsel while being advised of his Miranda rights; but instead of terminating the session, the officers proceeded to finish reading Smith his rights. Smith v. Illinois, 469 U.S. 91, 92-93, 105 S.Ct. 490, 491, 83 L.Ed.2d 488, 492 (1984). After requesting the assistance of counsel, the interrogating officers then pressed Smith about his request by asking him a second time if he wanted a lawyer. Smith eventually equivocated and agreed to talk without a lawyer present. Smith v. Illinois, 469 U.S. 91, 92-93, 105 S.Ct. 490, 491, 83 L.Ed.2d 488, 492 (1984). Smith v. Illinois demonstrates the rigid rule of Edwards that interrogation must cease once counsel has been requested. For in Smith, the Court held that responses to further interrogation after the accused has requested counsel may not be used to cast doubt on the clarity of the initial request for counsel. Smith v. Illinois, 469 U.S. 91, 100, 105 S.Ct. 490, 495, 83 L.Ed.2d 488, 496 (1984).
As this court noted in Balfour I, Susie Ann Balfour asked for an attorney at the time of arrest, and the only testimony in this record concerning the events of October 7, 1988, comes from Balfour:
Conspicuous by its absence is the interrogating officers' version of the events. On the record before this Court, Balfour stated she asked for an attorney and was not going to sign any documents or answer any questions without having a lawyer present; this is buttressed by her refusal to sign the first rights' waiver on October 7. After reading the record, it appears to us Balfour invoked her right to counsel.
Balfour v. State I, 580 So.2d 1203, 1208 (Miss. 1991) (emphasis added).
Here, we find the necessary, "requisite expression" needed for Balfour to invoke her Fifth Amendment right against compulsory self-incrimination. As noted in McNeil, in order to invoke the Fifth Amendment right, the invocation requires at a minimum, "some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." McNeil v. Wisconsin, 501 U.S. ___, ___, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158, 169 (1991).
At both hearings on the Motion to Suppress Balfour's statement of confession, Investigator Radford and Deputy Smith testified that they were unaware that Balfour asked for an attorney on the morning of her arrest, October 7, 1988. Nonetheless, Radford's and Smith's lack of knowledge of this fact is of no consequence. For the rule is that all State actors are charged with knowledge of Balfour's previous request for counsel. Arizona *746 v. Roberson, 486 U.S. 675, 687, 108 S.Ct. 2093, 2101, 100 L.Ed.2d 704, 717 (1988); Balfour v. State I, 580 So.2d 1203, 1208 (Miss. 1991). "If the accused requests access to counsel, all officers of the prosecution force are bound thereby even those who have no actual knowledge of the request." Kirkland v. State, 559 So.2d 1046, 1047 (Miss. 1990).
The facts and applicable law for this case yield but one inescapable result. The interrogation by Radford and Smith on the afternoon of October 11, 1988, violated the accused's Fifth, Sixth and Fourteenth Amendment rights. Not only was Balfour's waiver on October 11th invalid, but also the prosecution was barred from further interrogation and contact following the morning of October 7th when Balfour first requested a lawyer and declined to waive any rights. Such result follows from the rule of Edwards v. Arizona, 451 U.S. 477, 484, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378, 386 (1981), and recently reaffirmed in Minnick v. Mississippi, 498 U.S. ___, ___ 111 S.Ct. 486, 491, 112 L.Ed.2d 489, 497 (1990). Therefore, like the Sixth Amendment violation, the confession was likewise tainted by violation of Fifth Amendment rights. Consequently, the case must be reversed and remanded for a new trial wherein the confession statement will not be allowed into evidence.

B. The trial court erred in that during the sentencing proceedings it allowed the State of Mississippi to question the appellant in an improper and speculative manner when the State questioned Appellant concerning future robberies which had been not committed and further insinuated that she would have been a willing participant until caught or someone was killed. Such behavior by the State was designed to inflame the jury and cause unfair prejudice to her right to a fair trial in the sentencing phase.
In the sentencing phase of the trial, the State introduced three judgments of conviction for prior armed robberies as an aggravating circumstance pursuant to Miss. Code Ann. § 99-19-101 (Supp. 1991). Balfour took the stand in her own defense, and on cross-examination, the district attorney repeatedly questioned Balfour on "how many more" robberies she intended to commit before she was arrested and taken into custody on October 7, 1988.
Q. I thought you said in your statement that you told Kirby that you would get a job, and he said y'all could make more money robbing folks?
A. Yes, sir. Well, I still wanted  I still looked for a job.
Q. And, of course, there's no question that once you decided that it was easier to make money robbing and stealing than working an honest day's work, you hit  you and Kirby hit on the 4th day of October Mills Self Service in Olive Branch?
A. Yes, sir.
Q. Right?
A. Yes, sir.
Q. On the 6th day of October the little store down in Holly Springs down in Marshall County, the Junior Food Mart?
A. Yes, sir.
Q. And then on the 7th day of October the Circle K?
A. Yes, sir.
Q. How many more would you have robbed had you not gotten caught, Ms. Balfour?

MR. PEARSON: May it please the Court, I would suggest that's too speculative to require an answer.
THE COURT: I'll overrule the objection.
BY MR. WILLIAMS:
Q. The truth of the matter is you would have kept doing it and kept doing it and kept doing it until you either got caught or somebody got killed, right?

A. (No response).
MR. PEARSON: May we have a continuing objection to this line of questioning, please, Your Honor?
THE COURT: Yes.
BY MR. WILLIAMS:
Q. That's true, isn't it?
A. I don't know.

*747 Q. Well, you hit one on the 4th, you hit one on the 6th and you hit one on the 7th; that's three in three days. Don't you know, Ms. Balfour, that you would have kept on robbing stores and putting that mace in folks' eyes and stealing their money until you got caught or somebody got killed whichever happened first? Right?

A. (No response).
Q. Isn't that right?
A. I don't know.
Q. You don't know?
A. (No response).
Q. You're not telling this jury that you figured the Circle K would be y'all's last job, are you?

A. Pardon?
Q. Ma'am?
A. Pardon me?
Q. You're not wanting this jury to believe that you and Kirby had decided that the Circle K would be your last job, are you?

A. I'm not saying that. I don't know if that would have been.
Q. You know, ma'am, that you were going to rob and rob and rob and rob and hurt innocent folks until you got caught or somebody killed, and that's true, ain't it?

A. No, sir.
Q. Well, you hit three in three days.
Who was next? Did you just ride at random and prey on innocent hardworking people trying to earn a living by the sweat of their brow at night?
A. I know that was wrong now.
Balfour argues that the District Attorney's questioning about her propensity to commit future crimes was error since propensity is not one of the eight aggravating circumstances authorized by Miss. Code Ann. § 99-19-101(5) (Supp. 1991). Balfour's point has force.
The eight aggravating circumstances are as follows:
(5) Aggravating circumstances shall be limited to the following:
(a) The capital offense was committed by a person under sentence of imprisonment.
(b) The defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person.
(c) The defendant knowingly created a great risk of death to many persons.
(d) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, aircraft piracy, sexual battery, unnatural intercourse with a child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or felonious abuse and/or battery of a child in violation of subsection (2) of section 97-5-39, or the unlawful use or detonation of a bomb or explosive device.
(e) The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
(f) The capital offense was committed for pecuniary gain.
(g) The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
(h) The capital offense was especially heinous, atrocious or cruel.
Miss. Code Ann. § 99-19-101(5) (Supp. 1991) (emphasis added).
Balfour acknowledges that her three prior convictions were fair game as aggravating circumstances; however, she wages a strong argument that questioning which suggested her propensity for future criminal activity was highly prejudicial for the jury to hear, as well as violative of the above Code section. The State correctly frames the issue as follows: "Was cross-examination as to the potential to commit future crimes proper?" The answer is, no.
Aggravating circumstances are to be limited to the eight factors enumerated in Miss. Code Ann. § 99-19-101 (Supp. 1991). "[T]he state is limited to offering *748 evidence that is relevant to one of the aggravating circumstances included in § 99-19-101." Stringer v. State, 500 So.2d 928, 941 (Miss. 1986); See Coleman v. State, 378 So.2d 640, 648 (Miss. 1979). Propensity to commit future crimes either is, or is not, one of the eight enumerated factors. Clearly, it is not. While some jurisdictions do provide for propensity for future dangerousness as a statutory aggravating factor, such is not the case in Mississippi jurisprudence. Compare Miss. Code Ann. § 99-19-101(5) (Supp. 1991) with Idaho Code § 19-2515(g)(8) (1987) and Tex. Code Crim. Proc.Ann. art. 37.071 § 2(b)(1) (Supp. 1992). The statutory mandate of § 99-19-101 can be no clearer. "Aggravating circumstances shall be limited to the following... ." Miss. Code Ann. § 99-19-101(5) (Supp. 1991). Therefore, as a matter of law, the trial court erred when it allowed the prosecutor to repeatedly explore the appellant's propensity for future crimes.
Nothing which is stated here is inconsistent with our recent decision in Hansen v. State, 592 So.2d 114 (Miss. 1991). In Hansen, the appellant argued that evidence of his ten prior felony convictions was prejudicially repetitive in light of the fact that proof of only two felony convictions was necessary to establish habitual offender status. Hansen v. State, 592 So.2d 114, 144-45 (Miss. 1991). Our approach to Hansen's claim focused on whether or not the trial judge abused his discretion in considering the relevancy of all ten convictions (M.R.E. 401), balanced against concerns of unfair prejudice, repetition, redundancy, etc. (M.R.E. 403). We concluded that ten convictions over a span of ten years furnished substantial rebuttal evidence that Hansen lacked the ability to conform his behavior to societal norms. Since Hansen was afforded great leeway in proving mitigation of a troubled youth and positive behavioral points, then a fair rebuttal would include the ten prior convictions which were as much a part of his life as the factors suggesting mitigation. Hansen, 592 So.2d at 145.
A word of caution would be that our holding in Hansen is not an open season license for prosecutors to circumvent the plain mandate of § 99-19-101(5), under the guise of relevant Rule 401 rebuttal evidence. Balfour presents none of the considerations on this point which existed in Hansen, namely, a track record of ten convictions in ten years compared against a backdrop of positive evidence in mitigation covering the same ten year period. In Balfour, the prosecutor repeatedly hammered away in an attempt to secure a commitment from Balfour for her propensity to commit future robberies. This was not relevant rebuttal evidence for any evidence offered by the defendant in mitigation. For the reasons outlined above, this line of questioning was error.

C. The trial court erred in that it allowed the State of Mississippi to question the witness, Lawrence Kirby Payne, during its improper cross-examination about a certified lab report, and the findings contained therein, which were never offered into evidence during the trial, and of which the State of Mississippi knew this witness had no actual knowledge, knew it had no basis in fact for the questioning and did so question for the sole purpose of inflaming the jury and denying this appellant her right to a fair trial.
Balfour subpoenaed and called Lawrence Kirby Payne to the witness stand in her case-in-chief. At the time of Balfour's trial in October of 1989, Payne was serving time for robberies which he committed with Balfour. However, Payne was also indicted for the capital murder of Lt. Lance, but he had not been tried on that charge. Payne, through counsel, informed Balfour's defense team that if called to the stand, he would invoke the Fifth Amendment to every question. Nonetheless, Balfour's attorneys called Payne as a witness. Payne answered only two questions which pertained to his name and his age.
As an element of Balfour's defense, she sought to convey the message that she was using cocaine during the October crime spree and did not have full control of her faculties. As a means to this end, Balfour's attorney asked Payne the following questions on direct examination:

*749 Q. Do you know whether or not she partook of any drugs on the late night of October 6 or early morning of October 7?
A. Fifth Amendment.
Q. Do you know whether or not she was under the influence of drugs on that late night of October 6 and early morning of October 7?
A. Fifth Amendment.
On cross-examination, the District Attorney questioned Payne about the lab results of Susie Balfour's drug screen test.
Q. Now, Mr. Pearson asked you about drug use. Were you aware, Mr. Payne, that Susie's blood was taken and tested negative to drugs?
MR. PEARSON: We object to that as being totally groundless of this particular witness unless the District Attorney has reasonable grounds to believe that this particular witness has personal knowledge thereof.
MR. WILLIAMS: I'm trying to find out.
THE COURT: I'll overrule the objection.
Q. Mr. Payne, do you know Anna Ezell at the Crime Lab in Jackson?
A. Fifth Amendment.
Q. Do you know that she is the one who tests blood for the presence of drugs or alcohol?
A. Fifth Amendment.
Q. Do you know that Susie Balfour's blood was tested for the presence of alcohol?
A. Fifth Amendment.
Q. Do you know that the test performed by Anna Ezell was negative for the presence of alcohol in the blood of Susie Balfour?
A. Fifth Amendment.
Q. Do you know that Susie Balfour's blood was tested by Anna Ezell at the Crime Lab for the presence of drugs?
A. Fifth Amendment.
Q. Do you know that the Scientist there at the Crime Lab, Anna Ezell, found no drugs in her blood?
A. Fifth Amendment.
MR. WILLIAMS: May I approach the Witness, Your Honor?
THE COURT: Yes, sir.
Q. Mr. Payne, I'm going to show you a certified laboratory report, Anna Ezell's drug screen and alcohol screen and ask you, first of all, whether or not you have ever seen that report.
A. Fifth Amendment.
MR. PEARSON: Your Honor, I'm sure the record does show that we have a continuing objection to all of this as being totally improper and inadmissible.
THE COURT: The record reflects the objection and it will be overruled.
Balfour's drug screen analysis had not been, and was never, offered into evidence at this trial. The State did not attempt to introduce Balfour's drug screen report as rebuttal evidence following Balfour's case-in-chief. The first, and only mention, of the drug screen lab results came when the prosecutor "questioned" Lawrence Kirby Payne on cross-examination in Balfour's case-in-chief. Clearly, the sole aim of the prosecutor's questions was to place before the jury, through the back door, Balfour's drug screen test results.
This issue is completely controlled by this Court's holding in Lanier v. State, 533 So.2d 473 (Miss. 1988). After a close review of Lanier, Balfour's argument alleging error in this line of questioning is well taken. Despite any claim by the State to the contrary, it is undeniable that the drug screen report was used to prove the truth that it purportedly asserted, that Balfour was not under the influence of drugs when she shot Lt. Lance. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Miss.R.Ev. 801(c). Without the testimony of a sponsoring witness with personal knowledge of the facts contained therein, the report was inadmissible, rank hearsay. Additionally, the issue is not one of impeachment, as the State alleges. Impeachment is for testing the believability of a witness on any subject. Lanier, 533 So.2d at 487. It is fundamental that before there can be impeachment, *750 there must be testimony which is impeachable. Payne provided no such testimony.
In Lanier v. State, a letter from a panel of Whitfield doctors concluded that Lanier was sane and needed no medical treatment. Lanier v. State, 533 So.2d 473, 487 (Miss. 1988). In the sentencing phase, the defendant called the jailer to the stand who testified that Lanier experienced certain episodes in jail which suggested mental incapacity and the need for professional psychological help. The testimony of the jailer was offered as a mitigating circumstance suggesting a mental/emotional disorder. On cross-examination of the jailer, the State questioned the jailer concerning the Whitfield letter's evaluation that Lanier was mentally healthy. Lanier, 533 So.2d at 487. The letter had not been introduced and was never discussed in the guilt phase of the trial. Lanier, 533 So.2d at 487.
First of all, this Court noted that the Whitfield letter was inadmissible hearsay. Lanier, 533 So.2d at 488. Furthermore, use of the letter violated the confrontation clause of the Sixth Amendment of the United States Constitution since there was no opportunity for Lanier to cross-examine the conclusions of the Whitfield doctors. Lanier, 533 So.2d at 488. Likewise, use of the drug screen report violated confrontation clause guarantees in this case since there was no opportunity to cross examine the conclusions of Balfour's drug screen report. "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend VI. See also Miss. Const. art. III, § 26. Guarantees secured by the confrontation clause exist separate and apart from the hearsay rules of evidence.
... the critical question under the confrontation clause is not compliance with common law hearsay rules, but fulfillment of the `mission of the confrontation clause to advance the accuracy of the truth determining process ... by assuring that the trier of fact has a satisfactory basis for evaluating the truth of a prior statement.'
Lefave and Isreal, Criminal Procedure § 23.3(d) at 877-78 (1985) (quoting California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)). See Lanier v. State, 533 So.2d 473, 488 (Miss. 1988). Without the opportunity to question Anna Ezell or whomever is responsible for the information contained in the report, Balfour's Sixth Amendment rights secured by the confrontation clause were violated, in addition to the fact that the report was hearsay. The manner in which Williams used the report provided no opportunity for Balfour to test the truth of the report. "[C]ross-examination is the best tool we have for exposing truth." Hall v. State, 539 So.2d 1338, 1346 (Miss. 1989).
In summary, this assignment of error has merit. The trial judge should not have allowed the prosecutor to place the drug report before the jury in a manner which violated hearsay rules and Constitutional guarantees.

D. The trial court erred in that it allowed the State of Mississippi to question improperly the witness, Lawrence Kirby Payne, with no basis in fact for the questioning whatsoever during the State of Mississippi's cross-examination, all of which was designed to produce irreparable injury to the appellant's defense; and, further, it was designed to inflame the jury thus causing the appellant undue prejudice and denying the appellant a fair trial.
In this assignment of error, Balfour complains of other cross-examination questioning of Payne. Knowing full well that Payne would not answer any questions, Balfour's defense team made the tactical decision to go ahead and call him as a witness. On cross-examination, the State questioned Payne on numerous instances about his confession as well as Balfour's confession:
Q. Isn't it a fact, Mr. Payne, that you told Mr. Radford and Detective Carter in your confession, `He (Officer Lance) had my right wrist and was going to handcuff it. He turned it aloose and twisted my other hand up and I was on my tiptoes. I heard a shot. I felt myself *751 going back. I turned to my left and looked back. He was still holding onto my arm. I was almost down and he lost his grip and he started firing and he hit me right above where my wallet goes, in the seat of my pants.' Did you say that to the officers?
A. Fifth Amendment.
* * * * * *
Q. This fifteen (15) page statement that I'm showing you, is this the confession that you gave to Mr. Radford and Detective Carter?
A. Fifth Amendment.
* * * * * *
Q. Susie says that it was all your idea to kill Officer Lance, Mr. Payne, is that true?
MR. PEARSON: May it please, the Court, I do not believe that there has been any testimony by Susie one way or the other in this cause and we object to that question.
THE COURT: Based on the testimony in the State's case in chief, I'll overrule the objection.
Q. I'll get specific with you, Mr. Payne. Referring to the confession of Susie Balfour that is into evidence to which I have referred, "Asked Kirby what to do. He said get rid of that stuff. Told him he would see me throw it out. Kirby told me to do what he said. When the car stopped, I threw two cans of mace out and the gun. Kirby got out of the car and came back to the car, opened the door and said, `Let me get my license.' The Officer said, `I don't want to see your license.' Asked what this was about  Kirby asked what this was about. The officer said, `You know what this is about.' When Kirby came back to the car, he told me to get the gun. I got out of the car. Asked the officer what was going on. He told me to get back in the car. Kirby was moving his mouth, telling me to get the gun and shoot him.'" Is that true or false?
A. Fifth Amendment.
Q. Did you tell this lady to kill and murder Billy Lance?
A. Fifth Amendment.
Q. `I was shaking my head.' When you told her the first time to kill Officer Lance, did she shake her head?
A. Fifth Amendment.
Q. "Then Kirby said, `Peaches, do what I tell you to do.'" Did you say to her, `Peaches, do what I tell you to do.'?
A. Fifth Amendment.
Payne testified prior to Balfour, although Balfour's confession, though erroneously admitted, was already in evidence at this point.
A criminal defendant must be allowed to call witnesses to the stand even though the defendant is aware that the witness, if called, will invoke the Fifth Amendment to every question. Hall v. State, 490 So.2d 858, 859 (Miss. 1986). In Williamson, and more recently in Hansen, this Court noted that when a witness invokes the Fifth Amendment, his silence does not constitute a denial which may be impeached. Williamson v. State, 512 So.2d 868, 874 (Miss. 1987); Hansen v. State, 592 So.2d 114, 133 (Miss. 1991). Therefore, Payne could not be impeached by the State for the confession statement which he gave. If Payne had testified and related a different version of events from his statement, then the prosecution could have impeached Payne. Hansen v. State, 592 So.2d 114, 133 (Miss. 1991); Harrison v. State, 534 So.2d 175, 179 (Miss. 1988); Miss. R.Ev. 613(b). Furthermore, it was impossible for Payne to impeach Balfour's testimony at this point since she had not taken the stand.
This brings us to an analysis of Confrontation Clause considerations regarding cross-examination questioning of Payne's own statement. "The general rule is that the prosecution may not use against the defendant the statement of a non-testifying co-defendant. The rule's empirical premise is that such statements are of dubious credibility save they be cured in the crucible of cross-examination." Hansen v. State, 592 So.2d 114, 133 (Miss. 1991). For guidance, we turn to this Court's recent opinion in Hansen v. State, 592 So.2d 114 (Miss. 1991), *752 and Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).
While Payne was on the stand, the prosecutor referred to Payne's own statement.
Q. Isn't it a fact that you told Mr. Radford and Mr. Carter with reference to the gun, "I had showed it to Susie and shot a few rounds off. I told her she shot up the bullets. She laughed and said, `No, I think I left one.'" She already knew how ...
MR. PEARSON: Your Honor, I think this is going into totally irrelevant and inadmissible testimony and would object to the line of questioning.
THE COURT: I overrule the objection.
Q. Isn't it a fact that you told Mr. Radford and Mr. Carter in your confession that Susie already knew how to shoot the pistol?
A. Fifth Amendment.
Q. Isn't it a fact, in your confession, that you told Mr. Radford ...
MR. PEARSON: Your Honor, being as we believe that all this type of testimony to be inadmissible, we would like to have a continuing objection thereto so we won't have to rise each time.
THE COURT: The record will so reflect. It will be overruled.
Q. Isn't it a fact, Mr. Payne, that you told Mr. Radford and Detective Carter in your confession, `He (Officer Lance) had my right wrist and was going to handcuff it. He turned it aloose and twisted my other hand up and I was on my tiptoes. I heard a shot. I felt myself going back. I turned to my left and looked back. He was still holding onto my arm. I was almost down and he lost his grip and he started firing and he hit me right above where my wallet goes, in the seat of my pants.' Did you say that to the officers?
A. Fifth Amendment.
In Douglas v. Alabama, the United States Supreme Court reasoned that the reading of a witness's statement who was invoking the Fifth Amendment to each question may, in the juror's mind, be the equivalent of testimony by the witness. "[T]he jury might improperly infer both that the statement had been made and that it was true." See Hansen v. State, 592 So.2d 114, 134 (Miss. 1991), quoting from Douglas v. Alabama, 380 U.S. 415, 419, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934, 937-38 (1965). As Justice Robertson noted in Hansen, "since the prosecuting attorney `was not a witness ... [who could] be tested by cross-examination,' the Court found an offense to Douglas' Confrontation Clause rights and reversed." Hansen v. State, 592 So.2d 114, 134 (Miss. 1991), quoting from Douglas v. Alabama, 380 U.S. at 419, 85 S.Ct. at 1077, 13 L.Ed.2d at 937-38.
As was the case in Hansen, the State argues that since it was Balfour who called Payne to the stand, then the door was opened for the prosecutor to "work his magic." In Hansen, this Court emphatically rejected this argument:
Hansen put Krecic on the witness stand, but he could not get her to say anything. She had testified to nothing except her name and address when tendered to the prosecution. She was at that moment easily as fresh a witness as Loyd was in Douglas and more manipulable because subject to the prosecution's leading questions. What the prosecuting attorney then did with Krecic is legally identical to what the prosecution in Douglas did with Loyd. Each is condemned on like authority and reasoning. Hansen's futile questioning of Krecic, albeit before the prosecution took its shot, established Krecic's `unavailability' within Douglas and Confrontation Clause jurisprudence. Cf. Rule 804(a)(1), Miss. R.Ev. That Hansen questioned Krecic first, while in Douglas the prosecution questioned Loyd first, is but a distinction without a difference.
The prosecution's `door-opening' thesis fails for the simple reason that such doors are opened co-extensive with what the opening party offers. Our focus is upon the answers elicited, not the questions asked. As Krecic said nothing, Hansen's calling her opened the door to nothing. All of this proceeds from the elementary truth that one party's calling a witness does not empower the other to *753 ask impermissible questions. See Ponthieux v. State, 532 So.2d [1239] at 1245-48 [Miss. 1988]; Murphy v. State, 453 So.2d 1290, 1294 (Miss. 1984). We may only hold the Circuit Court erred when it allowed the prosecution to question Krecic regarding her statement.
Hansen v. State, 592 So.2d 114, 135 (Miss. 1991).
To like effect, the D.A.'s questioning of Payne concerning Payne's statement was error. As in Hansen, it was Balfour who called Payne to the stand. On direct-examination, Payne's testimony yielded nothing; and, the prosecutor is precluded from picking up the gauntlet and testifying for Payne. See Douglas v. Alabama, 380 U.S. at 419, 85 S.Ct. at 1077, 13 L.Ed.2d at 937-38. For when the prosecutor, through the use of leading questions, parades before the jury the "testimony" of the silent witness, such action violates the Confrontation Clause since the prosecutor cannot take the stand to be cross-examined by the defendant about the silent witnesses' "testimony".
Finally, unlike the outcome in Hansen, we decline the opportunity to assess the error to see how it would fair under harmless error notions of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and Yates v. Evatt, 500 U.S. ___, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991). As already noted, other errors of compelling gravity require reversal and remand in this case.

E. The trial court erred in that it failed to grant a mistrial based on the release of juror Chandler after jury deliberations had begun, and the replacement of her with an alternate juror was in violation of the laws of the State of Mississippi.
While the jury was deliberating in the sentencing phase, the foreman of the jury sent a note out to the trial judge. The note stated as follows:
Judge Carlson, at this time one of our members has disclosed that she is against the death penalty in all situations and she did not understand your instructions concerning this on Monday, October 9. What can you advise us if anything.
The judge immediately shared the note with all attorneys and invited comment from both sides. The State requested that the juror be removed and replaced with an alternate. The judge decided to bring the juror into chambers and question her in order to learn more about the note and the juror's position. The bailiff brought juror Sara Chandler into chambers, and the trial judge questioned juror Chandler in more detail regarding her views on the death penalty.
THE COURT: Let me just go back to this statement again, that she, referring as I now known to you, `She is against the death penalty in all situations.'
JUROR CHANDLER: I am. At this point I am.
THE COURT: What I'm trying to figure out, you said, `At this point I am.' When 
JUROR CHANDLER: What I'm saying  okay, Monday  when I first come in Monday, I didn't know, you know, what the whole thing was about. That was my first point of view. When you got up Monday and said, you know, about did anybody have anything about, you know, the death penalty or life, I really didn't know what I was  what was going on. If I had knew, I would have stood up then, that's what I'm saying, but I just didn't understand.
The court dismissed juror Chandler and called the first alternate into chambers for questioning. After questioning the alternate, the judge determined that she had been present and had heard all of the testimony and evidence in both the trial and the sentencing phase. Further, the court concluded that the alternate had been sequestered in a separate room throughout the week and had not discussed the case with anyone as instructed by the court. After being satisfied that the alternate was qualified to serve, the judge called the jury back into the courtroom and seated the alternate. The trial judge instructed the jury to begin its deliberations anew:

*754 THE COURT: Members of the jury, I had previously received the note that you had sent to me, and I have excused Juror No. 3 in the order of selection, Ms. Sara A. Chandler. Alternate No. 1, Ms. Helen Thompson Stewart, has now been placed in the jury box with you, and at this point I simply request now that you return to the jury room and begin anew your deliberations so that all of you including Ms. Stewart can have all the time you need to freely discuss the case among yourselves, to consider all the evidence, to consider the law and fairly consider all the options available to the jury.
So at this point I will request that you now return to the jury room and begin anew your deliberations.
For this issue, we can do little more than to point out that the law of this State requires alternates to be discharged when the jury retires to deliberate. Miss. Code Ann. § 13-5-67 (Supp. 1991).
Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties ... An alternate who does not replace a regular juror shall be discharged at the time the jury retires to consider its verdict.
Miss. Code Ann. § 13-5-67 (Supp. 1991) (emphasis added).
This court recently addressed this issue in Folk v. State, 576 So.2d 1243, 1249 (Miss. 1991), a capital rape case wherein the juror was excused for not considering the views of her fellow jurors after almost two hours of deliberation. In recognition of the statute, Folk emphasized that substitution of a juror with an alternate must occur prior to the time the jury retires to consider its verdict.
In other cases where a regular juror is disqualified, this Court has approved substitution of an alternate juror where this is done before the jury retires to begin deliberations. Myers v. State, 565 So.2d 554 (Miss. 1990); Shaw v. State, 540 So.2d 26 (Miss. 1989).
In the case sub judice, the substitution was made after the alternate jurors had been dismissed from jury service and after the jury had been in deliberations for almost two hours. More importantly, the Court made the substitution after juror Boyd had been finally discharged without sequestration or instruction. In this the Circuit Court erred.
Folk v. State, 576 So.2d 1243, 1251-52 (Miss. 1991). (emphasis in opinion). See Myers v. State, 565 So.2d 554 (Miss. 1990); Carr v. State, 555 So.2d 59 (Miss. 1989); Brown v. State, 529 So.2d 537 (Miss. 1988); Shaw v. State, 540 So.2d 26 (Miss. 1989); Stevens v. State, 513 So.2d 603 (Miss. 1987); Odom v. State, 355 So.2d 1381 (Miss. 1978).
In Myers v. State, this court explained the trial court's only course of action wherein following a jury verdict, a party shows that a juror has withheld substantial information:
Following a jury's verdict, where a party shows that a juror withheld substantial information or misrepresented material facts, and where a full and complete response would have provided a valid basis for challenge for cause, the trial court must grant a new trial, and, failing that, we must reverse on appeal.
Myers v. State, 565 So.2d 554, 558 (Miss. 1990).
For the reasons stated herein, we find that it was error for the trial court to excuse a juror after the jury had retired to deliberate a sentencing verdict. The course of action by the trial court violated both statutory law and settled principles of common law.

F. The refusal to permit the defense to voir dire those jurors eliminated pursuant to Witherspoon v. Illinois and Fuselier v. State violated Susie Balfour's constitutional rights.

Balfour argues it was error for the trial court to deny her attorneys an opportunity to rehabilitate prospective jurors who had expressed reluctance to vote for the death penalty. Voir dire of the jury panel was conducted as follows. The court first voir dired the venire and identified those jurors who expressed reservations or concerns *755 with the death penalty. Then, both the prosecution and the defense were allowed an opportunity to further question the panel, and both sides asked additional questions. The next morning, the court conducted individual, sequestered voir dire of prospective jurors who expressed death penalty reservations on the previous day It was at this point, during individual, sequestered voir dire, when the defense was denied "rehabilitative" voir dire.
Before examining the facts at bar, a few fundamentals are in order. In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court attempted to clarify the Witherspoon juror exclusion standard in death penalty cases. See Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The proper standard is as follows:
is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with Witherspoon's reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism ... . many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings ... . there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law ... . deference must be paid to the trial judge who sees and hears the juror.
Wainwright, 469 U.S. at 424-25, 105 S.Ct. at 852-53, 83 L.Ed.2d at 851-53; Pinkney v. State, 538 So.2d 329, 345 (Miss. 1988) (judgment vacated and case remanded in light of Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990)); Lockett v. State, 517 So.2d 1317, 1335 (Miss. 1987); Fuselier v. State, 468 So.2d 45, 53-54 (Miss. 1985).
However, jurors who oppose the death penalty or believe it unjust, may serve as jurors in capital cases "so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." Lockhart v. McCree, 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137, 149-50 (1986); Hansen v. State, 592 So.2d 114, 128 (Miss. 1991). In other words, personal opposition to capital punishment is not a constitutional impediment to juror service so long as the juror is able to set aside his or her personal belief and fairly consider all sentencing options under the rule of law.
The remedy for a juror wrongfully excluded is potent. In Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976) (per curiam), the Court established a per se rule "requiring the vacation of a death sentence imposed by a jury from which a potential juror, who has conscientious scruples against the death penalty but who nevertheless under Witherspoon is eligible to serve, has been erroneously excluded for cause." Gray v. Mississippi, 481 U.S. 648, 659, 107 S.Ct. 2045, 2052, 95 L.Ed.2d 622, 633-34 (1987) (citing Davis, 429 U.S. at 123-24, 97 S.Ct. at 399-400, 50 L.Ed.2d at 341.).
Balfour's argument is not that the trial court violated Witherspoon, per se, by the exclusion of three prospective jurors. Rather, Balfour alleges error in the trial court's refusal to allow defense counsel's request to question the prospective jurors in a rehabilitative effort. This court recently addressed this issue, referred to as Witherspoon  with a twist, in Hansen v. State, 592 So.2d 114, 127 (Miss. 1991).
Specifically, Balfour directs this court's attention to three instances wherein defense counsel was denied an opportunity to examine potential jurors. Granted, we find that two of the potential jurors were clearly Witherspoon excludable upon close review of the record. However, the response *756 by a third prospective juror was unspecific and vague:
THE COURT: Okay. Well, I guess what it boils down to is when you're back in the jury room in this second phase, if you got to that point and you were on the jury, recognizing both sides are entitled to a fair trial, could you follow the instructions that I give you on how to go through and determine whether the defendant should suffer death or life imprisonment; and going through and following those instructions under your oath as a juror, could you consider both options and vote one way or the other, either life or death based on the evidence and the law?
PROSPECTIVE JUROR ORA D. BAILEY: I could follow  if I understood  if I'm understanding clearly, I could follow  I could read it, but it would still more or less be life imprisonment.

In Hansen v. State, this court re-endorsed the rule of Phenizee v. State that the parties are entitled to further, supplementary examination to that of the trial judge. Phenizee v. State, 180 Miss. 746, 753-54, 178 So. 579, 582 (1938). We can do no more to improve upon this point than that which we stated in Hansen:
Historically, the procedural authority for this inquiry derived in part from Miss. Code Ann. § 13-5-69 (1972), which at the time of trial provided:
The parties or their attorneys in all jury trials shall have the right to question jurors who are being impaneled with reference to challenges for cause, and for peremptory challenges, and it shall not be necessary to propound the questions through the presiding judge... .
We have recognized in Phenizee v. State, 180 Miss. 746, 753-54, 178 So. 579, 581-82 (1938), that this rule means what it says.

Hansen v. State, 592 So.2d 114, 128 (Miss. 1991) (emphasis added). In the 1991 legislative session, Miss. Code Ann. § 13-5-69 (1972), was amended to merely reflect that rules governing the examination of jurors are subject to the rules promulgated by this court. Miss. Code Ann. § 13-5-67 (Supp. 1991). See Miss.Unif.Cir.Ct.R. 3.02; Miss.Unif.Crim.R.Cir.Ct.Prac. 5.02.
While it was error for the trial judge to refuse defense counsel an opportunity to further examine potential jurors, we make no comment regarding the "harmless error" consequences of such error since this appeal is reversed on other grounds.

G. By taking no action to control the number of uniformed, armed law enforcement officers who came to encourage a verdict of guilty and a sentence of death, the trial court abdicated his responsibility to guarantee a fair trial.
Finally, we note that in capital murder cases where the victim was a member of law enforcement, the potential exists for a coercive atmosphere when uniformed law officers sit together in a group. Consequently, we discourage this practice. One obligation of the trial judge is to maintain order and suppress any disturbance which might prejudice the rights of either side. Boches v. State, 506 So.2d 254, 261 (Miss. 1987); Dean v. State, 173 Miss. 254, 285, 160 So. 584, 588 (1933). And, the right to a fair trial includes the right to a verdict based on the evidence and not one influenced by some extraneous matter or event. Fuselier v. State, 468 So.2d 45, 53 (Miss. 1985).
We observe that the potential for an overbearing influence is easily diffused when the court requires law enforcement personnel to wear street clothes when attending trial in a spectator capacity or when uniformed personnel are dispersed in the courtroom.

CONCLUSION
Because we find clear constitutional violations under well settled law of Balfour's Fifth, Sixth and Fourteenth Amendment rights as well as rights secured by Art. III, § 26 of the Mississippi Constitution, we are left with no alternative but to reverse the conviction for capital murder. In addition to constitutional violations discussed herein, we have noted other errors which occurred *757 in the trial below such as improper cross-examination of witness Lawrence Kirby Payne by the State, the wrongful excusal of a juror in the deliberation stage of the sentencing trial, evidence of a non-statutory aggravating circumstance, and wrongful denial of defense attorney's voir dire of prospective jurors. It follows, then, that the sentence of death is vacated, and this case is remanded to the DeSoto County Circuit Court for a new trial.
CONVICTION OF CAPITAL MURDER REVERSED; SENTENCE OF DEATH VACATED; CASE REMANDED FOR NEW TRIAL.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
PRATHER, J., not participating.