JOHNSON, Judge.
This plaintiff was an employee of Thomas W. Hooley & Sons on June 24, 1957, when he claims to have had an accident on the job. He sued the defendant to recover maximum workmen’s compensation, alleging permanent, total disability to have resulted from said accident. The Civil District Court for the Parish of Orleans rendered judgment after trial dismissing plaintiff’s suit and plaintiff has appealed.
The evidence in this case discloses that plaintiff has had quite an erratic history as to job changes, accident proneness, compensation claims and compromise settlements. There is not much said about him prior to 1940 when he went into the armed service. A little over a year and three surgical operations later, plaintiff was discharged from the service. He said he was told on being discharged that he had too many operations. Since that time he has worked spasmodically from a day to a few months at various places and on many jobs in Mississippi and Louisiana. Reference is made in the testimony to several claims for workmen’s compensation, particularly when he was hurt on a boat working for Jahncke Service Company in 1950, which claim he compromised for $2,000.00, and while working at Kaiser Aluminum Company in 1952, when his ankle was broken which required surgical operations. He drew maximum compensa *146 tion following that accident amounting to $2,520.00, after which he made a compromise settlement of $5,000.00 additional, plus $1,596.00 for medical expenses.
It is impossible to recite with any accuracy in chronological order the respective jobs, their duration and the various accidents he has referred to since being discharged from the army. Suffice it to say they are numerous. In his testimony attempting to give the name of an employer or the place or time of employment and names of doctors to whom he went from time to time he very often wound it up with the statement “I am not sure.” It is entirely understandable why he isn’t sure for the reason that there have been so many jobs in so many different places, each of such short duration.
Follorving several accidents prior to June 24, 1957, the plaintiff made the same complaints that he now makes. Fie said that he was nervous in the army but does not know when it started. Referring to the accident on the boat in 1950 he said his nervousness was aggravated. He recited various jobs and accidents when he suffered the same nervousness, loss of sleep, loss of appetite, loss of weight, all prior to June, 1957. Following the boat accident he filed a civil action in the United States District Court in which he alleged that:
“As a result of the said accident, complainant sustained severe injuries to the brain, central nervous system, sensory nerves, and the bones, blood-vessels, ligaments, tendons, muscles, and other parts of the head, neck, extremities and body, including concussion, postconcussion, syndrome, cortical and other diffuse cerebral damage, epilepsy, herniae, and other physical, mental and nervous injuries, and residuals.”
On June 24, 1957, plaintiff was working for defendant, Thomas W. Hooley & Sons, cleaning with a wire brush welding scales from metal cradles being constructed in defendant’s shop. Plaintiff claims that some fellow-worker turned one of the cradles, weighing some five or six hundred pounds, causing the leg of the cradle to strike plaintiff, thereby severely injuring him. Plaintiff’s petition alleges practically the same things the matter with him resulting from this accident as he alleged in his suit as having resulted from the accident in 1950. Plaintiff testified that the accident has caused him to be nervous, on edge, to break out in cold sweat, and to have pains all through the stomach and all up the spine, nausea all of the time and can’t work continuously. After being sent to the company doctors, he stated that in the course of time since the accident he has been to a number of other doctors, none of whom he called as witnesses on the trial of the case. The only fellow-worker he called to substantiate his claim that he was struck by the heavy iron was Mr. Moreau, defendant’s foreman.
Moreau testified that he did not see the accident and when plaintiff reported that he was hurt Moreau sent him to the doctor. Moreau did say that plaintiff had worked about three weeks on the job and so far as he remembered was doing the work satisfactorily. He also said that he could take any young boy and teach him how to do the work within a few minutes. Plaintiff commenced work on May 30 and worked all of the first week to June 7th. The second week he missed one day, the third week he missed four days and from then to the 22nd he missed one day. Moreau said his record disclosed that the doctor discharged the plaintiff to report to work on July 3rd; that plaintiff came to work and worked one day and Moreaou has not seen the plaintiff since. Moreau does not recall any complaints by plaintiff on that one day he worked.
The only medical witness called by counsel for plaintiff was Dr. Morton L. Enelow, who specializes in psychiatry. This witness saw the plaintiff the first time on September 27, 1958, a second time on October 8, 1958, and the third and only other time on April 27, 1959. The doctor diagnosed plaintiff’s *147 trouble as being “accident neurosis.” The doctor said he arrived at that conclusion on his first interview with plaintiff and the other two interviews were merely corroborative. He defined accident neurosis thusly:
“This is a neurosis that results from an individual who is predisposed to develop such a neurosis, when a situation that is so — such a neurosis occurs when a stress that is sufficient occurs. It’s an emotional disturbance that affects the individual’s personality. It occurs as a result of what occurs to the individual’s personality, something severe enough to provoke the symptoms of this disorder.”
And further he said:
“I felt he had an accident neurosis which fits into the group of post-accident neurotic disorders.”
The doctor gave him tranquilizers as a temporary palliative.
The doctor was asked what procedure he followed in arriving at his diagnosis and he answered:
“Basically we follow the technique, I follow the technique of free association in obtaining what we call a mental status, evaluation of his past and present mental status, the state of his total emotional and mental situation to the use of psychoanalytical techniques, interviews.”
Dr. Enelow made his original diagnosis after his first interview of plaintiff without having seen reports of doctors and hospital records of data prior to his own examination and some of them prior to the accident of June, 1957. After being shown these reports and records the witness acknowledged that these psychiatrists had observed that plaintiff was neurotic prior to the accident of 1957. The doctor said he utilized some of these reports in evaluating plaintiff’s neurosis and said there was nothing inconsistent in any of the data with what he himself found.
On being questioned about how he determined that plaintiff was not a malingerer, the doctor said by depth interviewing, and he said further that:
“Psychonalytic interviewing gaining access to thought and feeling outside of his conscious awareness through the understanding of his words, dreams, et cetera, thoughts and feelings outside of his control.”
This doctor said he found evidence from these reports and records that after the accident of 1950 this plaintiff was suffering from a neurosis which agreed with what he found during his own examination. He said that what plaintiff “ * * * has is the personality of an individual with a long character neurosis — something additionally superimposed.”
As a final clincher, counsel for plaintiff asked this doctor for a conclusion of what causal connection, if any, plaintiff’s present condition is related to the accident of June, 1957. The witness said that the plaintiff fell in a pattern of neurotic personality, and that his adjustment prior to this accident had not been a completely healthy one. He said further that from his examination and from the medical data made available to him he feels there is “a reasonable probability that this man is disabled from performing duties as a welder’s helper as a result of this accident.”
Dr. Enelow attempts to justify his diagnosis by use of language that is completely unconvincing. This doctor had never seen this plaintiff or heard of him before September, 1958, which is more than a year after the accident of June, 1957. Pie then attempts to reconstruct plaintiff’s prior mental processes entirely at first on plaintiff’s own life history given by plaintiff to. the doctor. Dr. Enelow said his original diagnosis was corroborated by the records and reports which were made available to. him. The best he could come up with is. *148 that he feels there is a reasonable probability that plaintiff is disabled and that such disability is the result of the subject accident.
On June 24, 1957, the plaintiff reported to his foreman that he had suffered an accident on the job. Plaintiff was immediately sent to Dr. Houston where he arrived about 12:30 on that date. Dr. Houston examined him carefully and could find nothing whatsoever the matter with plaintiff. He could find no bruises, no sign, no echymosis and no evidence of any injury whatsoever. The plaintiff made such exaggerated complaints that Dr. Houston wanted to give him the benefit of any doubt, and, therefore, the doctor caused X-rays to be made, which were entirely negative. After seeing the plaintiff a few times and listening to his complaints of pain, Dr. Houston called in Dr. Tomsky, a urologist, and Dr. Soboloff, an orthopedist. None of these doctors could find anything the matter with plaintiff and they discharged him to go back to work on July 1, 1957, but plaintiff did not do it and came back to the doctor. After re-examination, the doctor discharged him on July 15, 1957, as having nothing the matter with him. Dr. Soboloff and Dr. Tom-sky both testified that they found nothing on which to base any report of any injury or disability whatsoever. In fact they could find no sign or evidence of any trauma at all.
In this connection, it is interesting to note that Dr. Soboloff treated the plaintiff for his ankle fracture in 1952, and had known the plaintiff over a number of years prior to this present accident
Following some alleged accident or injury in 1956, he was examined by Dr. Usdin, a psychiatrist, who was called by defendant as a witness in this case. Dr. Usdin testified that plaintiff was of low intelligence and that in 1956 he had complained of headaches, tension, restlessness, no sleep, loss of appetite, loss of weight and lack of interest in other activities. (These things are exactly the same ones now referred to both by the plaintiff and Dr. Endow). Dr. Usdin diagnosed plaintiff’s condition in 1956 as neurotic with a psychopathic personality. Dr. Endow says that his diagnosis of plaintiff’s present condition, is “accident neurosis.” Dr. Usdin said there is no such nomenclature as accident neurosis in their profession. Dr. Usdin further testified that this plaintiff was in 1956 and will never stop being a psychopathic personality, and psychiatry can be of no help to him. Dr. Endow thinks that psychotherapy treatments for a period of one to two years at fifteen to thirty-five dollars each might help him, meaning, the plaintiff.
Following plaintiff’s accident at the Kaiser Aluminum plant in 1952, Dr. William A. Roy was connected with the case. Dr. Roy specializes in general surgery. Dr. Roy testified that in 1952 he considered this plaintiff to exaggerate his symptoms to the extent that he advised the Kaiser Aluminum Company against reemploying plaintiff, and he was of the same opinion when he was connected with plaintiff in 1954. His examination and observation of plaintiff since the June, 1957, accident resulted in his opinion that this accident is not the cause of any disability suffered by this plaintiff. Dr. Roy says he is in position to disagree with Dr. Enelow’s conclusions as a result of his prior years of association with the plaintiff on a doctor-patient relationship.
There is no difficulty whatever in arriving at the definite conclusion that the trial Court was correct in dismissing plaintiff’s suit. There can be no doubt that there is a clear preponderance of evidence that this accident, granting there was one, has not caused or aggravated the neurotic disposition of the plaintiff. There is apparently no doubt on the part of the doctors who were more intimately connected with this case that plaintiff had no accident at all. The plaintiff called no fellow-workers to prove it, though they were working all around him and some of them doing exactly the same work as this plaintiff. The evidence is further clear that after other accidents prior to June, 1957, this plaintiff has *149 had the exact same condition as he now describes and there is nothing new or different in his physical or mental condition.
Moreover, the only statement by any person connected with this case that plaintiff’s neurosis is now worse is made by Dr. Enelow, who says that he concludes that plaintiff’s present neurotic condition lias reasonable probability of being caused by and as a result of the accident of 1957.
The language of the Court in Card v. Southern Builders, Inc., La.App., 117 So.2d 675, 678, applies completely to the evidence in this case now under consideration and we quote from it, as follows:
“Plaintiff’s contention that he sustained accidental injuries finds no support or corroboration whatsoever in the medical testimony or, in fact, from any evidence in the record. To the contrary the conclusion is inescapable that the conditions and difficulties of which plaintiff complains were existent prior to the date of his employment with Southern Builders, Inc. Reference is made in this regard to the medical testimony hereinabove referred to, as well as the testimony of his landlady. Mrs. Tyner testified that plaintiff, while sitting in her kitchen talking to her about the condition of his leg, stated his intention to obtain a job with some good company and get himself hurt so that he would not have to work any more— that he would be taken care of. Mrs. Tyner’s testimony is uncontradicted. Plaintiff did not deny making the foregoing statement, nor did he dispute her testimony that she observed the ulcers on the inside of his left ankle prior to his employment with the defendant.
“In considering evidence such as the above under the issues presented for determination in this case, certain well-established principles must be borne in mind. The jurisprudence is well settled that the plaintiff in a workmen’s compensation case carries the burden of proof, as in other civil cases, and is required to establish his claim to a legal certainty and by a reasonable preponderance of the evidence; that the establishment of such claim, only to the extent of possibility or probability is insufficient; and, that speculation, conjecture, mere possibility, and even unsupported probability, are not sufficient to support a judgment. Green v. Heard Motor Co., Inc., 224 La. 1077, 1078, 71 So.2d 849; Mitchell v. Brog-don, La.App., 106 So.2d 531; Keener v. Fidelity & Casualty Co. of New York, La.App., 96 So.2d 509; Bryant v. Employers Mutual Liability Insurance Co. of Wisconsin, La.App., 94 So. 2d 687; Roberts v. M. S. Carroll Co., Inc., La.App., 68 So.2d 689.”
We quote the following from Fortenberry v. Kingsville Timber Company, La.App., 136 So.2d 746:
“It has been repeatedly held that the plaintiff in a Workmen’s Compensation case must, as in other civil cases, bear the burden of proof and must establish his case by a reasonable preponderance of the evidence. Edwards v. Aetna Casualty & Surety Company, La.App., 108 So.2d 126. The establishment of a claim to the extent only of a possibility or even unsupported probability is not sufficient. Page v. Tremont Lumber Company, La.App., 108 So.2d 1.”
See also Davis v. Reynolds, La.App., 96 So.2d 368; Smiley v. LaSalle Timber Company, La.App., 108 So.2d 11.
For these reasons, the judgment appealed from is affirmed.
Affirmed.