KING, C.J.,
for the Court:
¶ 1. A jury sitting in Lowndes County Circuit Court found Tavares Showers guilty of manslaughter. Showers was sentenced to twenty years in the custody of the Mississippi Department of Corrections. Subsequently, Showers filed a motion for a judgment notwithstanding the verdict (JNOV) and/or a new trial. The motion was denied, and Showers appeals raising the following issues: (1) whether the trial court erred in refusing to grant a self-défense jury instruction that referenced the size discrepancy between Showers and the victim, (2) whether the trial court erred in finding Dr. Stephen Hayne qualified to testify as an expert witness, and (3) whether the trial court erred in admitting video footage of Showers, which was recorded inside an interrogation room of a police station, after he requested an attorney.
¶ 2. Finding no reversible error, we affirm.
FACTS
¶ 3. On December 14, 2007, Showers, who was sixteen years old, arrived home in Columbus, Mississippi, and asked everyone present to leave the room so he could talk to his mother, Monica Showers (Monica). Jeremy Munson, a guest of the family, refused to leave. Showers and Munson began fighting, and the dispute resulted in Showers stabbing Munson. Munson died as a result of his injuries.
¶ 4. Showers was arrested on the same evening and taken to the Columbus Police Department for interrogation. Showers was taken to an interview room, which was equipped with cameras to record the interrogation. Showers was interrogated by Officer David Criddle, who read Showers his Miranda rights. Officer Criddle asked Showers if he wished to sign a waiver of his Miranda rights, and in response, Showers stated: “Hmmmm — when it says I do not want a lawyer at this time. But I do want one because it was self-defense. It was really self-defense.”
¶ 5. Officer Criddle attempted to clarify whether Showers wished to give a statement, and Showers repeatedly expressed the need for a lawyer. Initially, the questioning ceased. Officer Criddle later returned to the interrogation room. At this point, Officer Criddle informed Showers that because he had invoked his right to counsel, the officer could not ask him any questions. Officer Criddle then told Showers that he was willing to listen to Showers’s side of the story and take a written statement. Upon further questioning, Showers admitted that he had anger-management problems for which he had been treated and prescribed medication, but he had failed to take his medication. Showers then began talking to Officer Criddle about the altercation with Munson. Showers admitted that he had initially confronted Munson, and Munson punched him; then Showers reacted by reaching for the closest object, a kitchen knife, in order to retaliate.
¶ 6. The officer then permitted Monica and Showers’s aunt, Bernice Coussets, individually, to enter the interrogation room and speak with Showers. Showers reiterated to Monica and Coussets that the incident occurred because Munson would not leave. Showers again stated that when Munson would not leave, he approached Munson. After Munson punched him, Showers retaliated with the knife. Showers’s conversations within the interrogation room were recorded both visually and *244 audibly and entered into evidence at Showers’s trial.
¶ 7. Other than the videotape, the only evidence introduced explaining the events leading to Munson’s death was the testimony of Showers’s sister, Laketa Showers. Laketa testified that she left the room when her brother requested; therefore, she did not see the beginning of the fight. Laketa stated that when she re-entered the room, Munson was holding Showers against the wall by Showers’s neck. According to Laketa, Showers was cutting Munson on his arm with a knife in an attempt to free himself. The fight ended when Munson let go of Showers.
¶ 8. Showers was indicted on the charge of murder. The jury found Showers not guilty of murder, but guilty of manslaughter. Showers filed a motion for a JNOV and/or a new trial; the motion was subsequently denied.
ANALYSIS
¶ 9. Showers has appealed the trial court’s decision to deny the motion fora JNOV and/or a new trial. A motion for a JNOV challenges the legal sufficiency of the evidence. Bush v. State, 895 So.2d 836, 848 (¶ 16) (Miss.2005). This Court must consider whether the evidence shows “beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test, it is insufficient to support a conviction.” Id. (citation omitted).
¶ 10. Showers’s motion for a new trial challenges the weight of the evidence. Bush, 895 So.2d at 844 (¶ 18) (citation omitted). An appellate court “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Id. Showers requests this Court reverse and remand this case with instructions for a new trial on each issue presented.
I. Self-Defense Jury Instruction
¶ 11. Showers argues that the trial court erred in refusing to grant a self-defense jury instruction that referenced the size discrepancy between him and the victim. “Whether to give a jury instruction is within the sound discretion of the trial court.” Chamberlin v. State, 989 So.2d 320, 341-42 (¶ 80) (Miss.2008) (citation omitted). We review the jury instructions given as a whole to determine whether the refusal of a particular instruction was in error. Taylor v. State, 763 So.2d 913, 915 (¶ 8) (Miss.Ct.App.2000). If the instructions fairly state the law of the case and no injustice is created, no reversible error will be found. Id.
¶ 12. The trial court gave Showers’s instruction on self-defense, which stated:
The Court instructs the jury that to make a killing justifiable on the grounds of self-defense, the danger to the defendant must be either actual, present and urgent, or the defendant must have reasonable grounds to believe that the victim intended to kill the defendant or to do him some great bodily harm, and in addition to this, he must have reasonable grounds to believe that there is imminent danger of such act being accomplished. It is for the jury to determine the reasonableness of the grounds upon which the defendant acts. If you, the jury, unanimously find that the defendant acted in self-defense, then it is your sworn duty to return a verdict in favor of the defendant.
¶ 13. However, Showers requested, but was refused, the following jury instruction:
If you believe from the evidence that the deceased was a much larger and strong *245 er person than the Defendant, and was capable of inflicting great and serious bodily harm upon the Defendant with his hands and that the Defendant had reason to believe and did believe as a man of ordinary reason that he was then and there in danger of such harm at the hands of the deceased and used a knife, with which he fatally stabbed the deceased, to protect himself from such harm, then the Defendant was justified, and your verdict shall be “not guilty” even though the deceased may not have been armed.
¶ 14. It is Showers’s position that the refused jury instruction would have informed the jury about the theory of his defense. Showers’s suggests on appeal that he was fearful of Munson because of Munson’s size; therefore, Showers reached for the knife and stabbed Munson in self-defense. The Mississippi Supreme Court has held that where an attacker is much larger than the one attacked, the nature of the assault, though only with fists, might be such as to show that the one being attacked is in danger of great bodily harm and, therefore, justified in the use of a deadly weapon to defend himself. See Manuel v. State, 667 So.2d 590, 592 (Miss.1995).
¶ 15. It is true that a defendant is entitled to have jury instructions given which present his theory of the case. Smith v. State, 802 So.2d 82, 88 (¶20) (Miss.2001). Even so, this entitlement is limited in that the court may refuse an instruction that is without foundation in the evidence. Id. During trial, testimony was introduced to establish that Munson was nine inches taller and nearly 100 pounds heavier than Showers, but the record contains no evidence to support Showers’s argument that he was fearful of being harmed by Munson and reacted to protect himself. In fact, while in the interrogation room at the police station, Showers stated to Officer Criddle, and then to Monica and Coussets, that while Munson struck the first blow, he originally confronted Mun-son. Showers never suggested that his actions resulted from a fear of Munson and his size disadvantage. In fact, during the conversation with Coussets, Showers stated that his strength was commonly underestimated because of his small size.
¶ 16. The trial court refused the specific jury instruction and explained that there was no testimony to support the suggestion that Showers was in fear of great bodily harm or death from Munson due to Munson’s size. After a review of the trial record, this Court finds that the trial judge was correct in refusing the jury instruction. There was no evidence presented to suggest that Showers was fearful of being harmed by the victim because of his size. In explaining the course of events to Officer Criddle and his relatives, Showers never expressed any sense of fear, only retaliation. Where there was testimony as to the difference in size between the defendant and the deceased, but no testimony that the defendant feared for his safety as a result of that size difference, the granting of a self-defense jury instruction which focused upon that size difference would have been an improper comment upon the evidence by the trial court. This issue is ■without merit.
II. Expert Testimony
¶ 17. Showers argues that Dr. Hayne is not qualified to testify as a forensic pathologist, and even if he is, the trial court improperly limited the voir dire of Dr. Hayne. The admission of expert testimony is within the sound discretion of the trial judge. Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 34 (¶ 4) (Miss.2003). The proper analysis for the admission of expert testimony is enumerated in *246 the Mississippi Rule of Evidence 702. Id. at 35 (¶ 6).
¶ 18. Mississippi Rule of Evidence 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
¶ 19. Dr. Hayne testified that he obtained a medical degree from Brown University, completed pathology training at Letterman Army Medical Center, and had more than thirty-years experience within the field of forensic pathology. Dr. Hayne’s testimony as to his medical training and experience within the field exhibited sufficient “knowledge, skill, experience, training, or education.” There is no suggestion within the record that the testimony was based on unreliable principles and methods or that Dr. Hayne misapplied the principles and methods to the facts of this case. Therefore, Dr. Hayne met the standard for admission of expert testimony.
¶ 20. Showers further argues that the trial court improperly limited the voir dire of Dr. Hayne, warranting a remand for new trial. Showers suggests that the trial court improperly limited voir dire by failing to apply Presiding Justice Diaz’s concurring opinion in Edmonds v. State, which determined Dr. Hayne was not qualified to testify as an expert witness. 955 So.2d 787, 802-03 (Miss.2007) (Diaz, P.J., specially concurring). In Edmonds, Justice Diaz referenced an article from the American Bar Association Journal in which Dr. Hayne’s qualifications were attacked as being unreliable and referred to Dr. Hayne’s testimony as “quack-spertise.” Id. However, the majority of the court in Edmonds held that Dr. Hayne was qualified to testify as an expert in forensic pathology. Id. at 792 (¶ 8). Further, even after the court’s decision in Edmonds, the Mississippi Supreme Court has found Dr. Hayne qualified to testify as an expert in forensic pathology within Mississippi courts. See Lima v. State, 7 So.3d 903, 907-08 (¶¶ 17-20) (Miss.2009). Because Dr. Hayne met the standard for admission of expert testimony, the trial court did not err in admitting his testimony or limiting the voir dire. This issue is without merit.
III. Miranda Rights
¶ 21. The final issue before this Court is whether the trial court erred in admitting the video footage of Showers inside the interrogation room that was recorded after he had requested an attorney. The admissibility of evidence is within the sound discretion of the trial judge. Ross v. State, 954 So.2d 968, 992 (¶ 44) (Miss.2007).
¶ 22. On the evening of the altercation, Showers was arrested and brought to the police station for questioning. Before any interrogation, Officer Criddle informed Showers of his right to remain silent and his right to an attorney as mandated by the United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Showers refused to waive his Miranda rights and requested an attorney. The interrogation initially ceased, and Officer Criddle left the room. Officer Criddle later returned to the room and told Showers thdt he was not allowed to ask him any questions, but he was willing to listen and take a written statement. As a result, Showers explained *247 to Officer Criddle that he had insisted on having a lawyer present because he stabbed Munson in self-defense. Showers admitted that he initially confronted Mun-son, and Munson punched him; then Showers reacted by reaching for the closest object, a kitchen knife, in order to retaliate. Officer Criddle left the room without asking any questions or making any comments related to the incident.
¶ 23. Shortly afterwards, Officer Crid-dle allowed both Monica and Coussets, individually, to enter the interrogation room and speak with Showers. Showers repeated the statements he made to Officer Criddle while talking to Monica and Cous-sets. The policy of the Columbus Police Department is to videotape all events occurring inside the interrogation rooms; thus, the video footage captured the conversations between Showers and Officer Criddle and Showers and his relatives. The police never warned Showers or his relatives that the events were being recorded.
¶ 24. Showers claims that admitting the videotape into evidence was a violation of his constitutional right to an attorney. The law is clear in regard to the protection of an accused’s constitutional rights during police interrogation. An accused must be warned of the right to remain silent and the right to an attorney before any custodial interrogation may occur, and once an accused asserts his right to an attorney, the right attaches immediately. Balfour v. State, 598 So.2d 731, 742 (Miss.1992) (quoting McNeil v. Wisconsin, 501 U.S. 171, 179, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)). Once the right has attached, “any statements obtained from the accused during subsequent police-initiated custodial questioning regarding the charge at issue (even if the accused purports to waive his rights) are inadmissible.” Id. Once an accused has expressed a desire for counsel, interrogation must cease unless the accused initiates further communication. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).
¶ 25. Initially, when Showers asserted his right to an attorney, Officer Criddle ceased the interrogation. That is reflected in the following exchange between Officer Criddle and Showers as found in a transcript of the videotape made by this Court for purposes of this appeal:
Officer Criddle:
Do you understand [your rights] Ta-vares?
Showers:
Nods affirmatively.
Officer Criddle:
OK, this next portion down here says:
I have read this statement of my rights and I understand what my rights are. I’m willing to talk to law enforcement officers and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.
Do you understand that portion of it? You sure?
Showers:
Nods affirmatively.
Officer Criddle:
Do you have any questions about that part?
Showers:
Hmmmm — when it says I do not want a lawyer at this time. But I do want one because it was self-defense. It was really self-defense.
Officer Criddle:
So what are you saying?
Showers:
I just need my lawyer.
*248 Officer Criddle:
Ok. Tavares, I’m not going to force you to do anything. Ok?
Showers:
But I’ll talk and tell you what happened but I need a lawyer. Want me to tell you what happened?
Officer Criddle:
I’m not asking any questions. (Comments on Showers’s shirt).
But anything you wanna tell me, I’d be glad to listen.
Showers:
It was self-defense. It was self-defense. I just need to talk to my mama.
¶ 26. Officer Criddle later returned to the interrogation room, and the following conversation took place between Officer Criddle and Showers:
Officer Criddle:
Ok Tavares. Ok, you’ve requested to talk to an attorney. So, since you’ve done that, I can’t ask you any questions. Ok? Cause that’s what the law says. I’ve called your mother. She’s on her way up here. She’s gonna come in here and talk to you. Alright? That’s what you — I told you if I could do it, I would do it. And I kept my word.
Showers:
May I have some water?
Officer Criddle:
I’ll get you some water.
Showers:
I’m just too nervous, man.
Officer Criddle:
I’m gonna give you some water.
But, before I leave here, we’re going to wait on your mama — I want you to know that you have requested a lawyer, but at any time if you decide you want to talk to me without a lawyer present, you can tell me that and you can talk to me. Ok?
Showers:
Yes, sir.
Officer Criddle:
If you want to give me a statement on what happened and put it on paper that’ll be fine.
Showers:
I just want to go ahead and give you a statement of what happened.
Officer Criddle:
So you don’t want a lawyer now?
Showers:
I want a lawyer.
Officer Criddle:
Ok.
Showers:
I’m just gonna give you a statement of what happened. The day was Friday. I was angry. I been [sic] angry ever since. Ever since I had gotten out of Diamond Grove, I been [sic] angry. I had stopped taking my medicine and stuff. Then — I was doing good. I was out making money and stuff — just regular people, what did — you know what I’m saying. When I got out, you know what I’m saying. It started Sunday. And then you know, I’ve been — I’ve been trying to forgive myself ever since. I pray every night now.
And then today, I talk and asked them nicely to leave. Not to leave, but said could /all please step outside because I wanted to talk to my mama alone, by herself. I already told her I felt like I was going to get in a fight. I said I had a feeling I was going to get in a fight. I had told her before I had left. I had left [to go] to the park with my friend.
I had come back home and asked them again. I’m telling you I was mad. (Inaudible statement). I asked them to leave. Then he was like why we gotta leave. I was like you do not stay here, *249 man. You do not stay here. Please leave. Then he was like what if I don’t leave? So I had walked up. And he had punched me right here. And then I just used the first thing I had put my hand on.
I didn’t try to. I just got a real, real, real serious temper problem. I don’t mean no harm to nobody. I don’t mess with anybody out there. I don’t do nothing [sic]. I come home. I respect my mama. Everything. But he had just swung on me. Made me mad. Then I get [sic] mad. I get [sic] mad! When I get mad, its like — I just blank out don’t know stuff when I get mad. I just pick up the first thing that was close to me and then start swinging. (Inaudible statement).
I don’t fight nobody [sic] in the street. I be [sic] to myself all the time. Everybody will tell you I be [sic] by myself unless I’m with one of my friends.
He had hit me. I did like this (stabbing motion) so he would move back but he just kept coming to me, so I just kept going like that (stabbing motion). I just panicked, just panicked. I didn’t try to do it. I hate that I did it though.
¶27. Clearly, Showers did not initiate the conversation; the officer did. Showers began to talk about the incident only after the officer initiated the conversation. Even as Showers explained that he reacted to Munson in self-defense, he still expressed his desire for an attorney. Because Showers clearly expressed his right to counsel and Officer Criddle initiated further conversation regarding the incident between Showers and Munson, the statements made in response to Officer Criddle while in the interrogation room are inadmissible. Therefore, the trial court erred in admitting the videotape that recorded the conversation between the officer and Showers.
¶ 28. Showers further argues that the trial court erred in admitting the video footage of Showers’s conversations with Monica and Coussets. It is Showers’s position that the police officers allowed his relatives into the room, while recording the conversations, in order to gain information. Thus, Showers suggests that the video footage is inadmissible because the actions of the police officers rose to the level of the functional equivalent of interrogation. “[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.” Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The functional equivalent of impermissible interrogation has been defined as “words or actions ... that the police should know are reasonably likely to elicit an incriminating response from the suspect.” Id. at 301, 100 S.Ct. 1682.
¶29. Even if the goal of the police officers in allowing Showers’s relatives into the interrogation room was to elicit a response from Showers, Mississippi courts have consistently held that questioning by a non-officer should not be regarded as an interrogation. See Brown v. State, 293 So.2d 425, 428 (Miss.1974). In fact, the United States Supreme Court has specifically held that allowing a suspect to speak with relatives does not rise to the functional equivalent of an interrogation. See Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). Therefore, we find the trial court did not error in admitting the video footage of the conversations between Showers and his relatives.
¶ 30. Even though the trial court erred in admitting the video footage of the conversation between Showers and the officer, the content of the conversations between Showers and the officer and Showers and his relatives was identical.
*250 ¶ 31. We quote the pertinent parts of the conversation that occurred between Showers and his mother:
Monica:
They got to question you.
Showers:
... They came in here, asked me did I want to talk to [Officer Criddle] and read a paper to me. And then he told me if I signed it, then I’m going to tell him but if I not sign [sic] the paper, he isn’t going to ask me nothing. I told him I’d wait until I get a lawyer to talk.
[[Image here]]
Monica:
Let’s see what they charging [sic] you with first.
Showers:
Murder.
Monica:
That’s what they told you.
Showers:
No. But he [is] dead. If he [is] dead, that [is] straight murder.
Monica:
No, it’s self-defense, Tavares.
Showers:
I know it’s self-defense, but if he [is] dead, they [are] going to charge me with murder, mama. (Inaudible statement). I tried to tell you, mama. But you didn’t want to listen.
Monica:
Tell me what?
Showers:
I tried to tell you. I tried to tell you Sunday including until today. I tried to tell you, but you didn’t want to listen.
Monica:
Tell me what?
Showers:
Send me back to Diamond Grove. But you didn’t want to listen. I didn’t want everybody to know what I wanted to talk about. I tried to tell you. I had a feeling I was going to get to fighting. You know, I wish you had told them to step outside for a minute.
[[Image here]]
Showers:
Did you see how he punked me? Ain’t nobody punk me and get away with it. Now, I got me wearing orange for life.
Monica:
That just your mind. (Inaudible statement). You thinking all the wrong things.
Showers:
I can’t think right when I’m scared, mama.
Monica:
You need to sleep it off.
Showers:
I don’t be getting no [sic] sleep as it is. Wake up seven, six in morning and can’t go back to sleep.
Monica:
Inaudible statement (question regarding not sleeping).
Showers:
I be [sic] asleep during school.
Monica:
Should have been taking that medication.
Showers:
I was taking the medicine — I had stopped taking the medicine — I had stopped taking the medicine when I was sleeping at school.
[[Image here]]
Monica:
Just tell them everything that happened, you think that happened, you felt that happened.
Showers:
*251 I already told them. I asked [Munson] nicely to leave, and then he got smart. So I walked up. He threw a punch, and I grabbed the first thing that came to me and that’s what happened. It was self-defense.
¶ 32. Once his mother left the interrogation room, Showers’s aunt was permitted to speak to Showers. We quote the pertinent part of the conversation that occurred between Showers and his aunt:
Showers:
[P]eople just think I’m weak because my body size. I’m a small sized person. That’s why I get that. Cause, I asked [Munson] nice to leave. I asked all of them. I told [list of names]. I said y’all, could y’all please step outside and let me talk to my mama real quick. I told them just like that. (Inaudible statement). I said forget him anyhow. I told him just like that. Then he was like — and I walked up and he just hit me. And I grabbed the first thing I put my hands on.
Coussets:
Is that what you told the police?
Showers:
I hadn’t talked to them. I told them I didn’t want to talk to them without no [sic] lawyer. (Inaudible statement). These folks don’t care about no [sic] black people, man. That’s all the white man wants. They want us to mess up so they can lock us away. And they never show no [sic] sympathy. None, whatsoever. You know why I had ran, I was scared.
¶ 33. During the conversations with Monica and Coussets, Showers reiterated his request for an attorney and claimed that his actions against Munson were taken in self-defense. Showers admitted to Monica that he needed his medication and that he had been feeling angry and had an impulse to fight. Showers also admitted to both Monica and Coussets that he had initially approached Munson out of anger. Showers never expressed any fear of Mun-son. Showers stated that Munson punched him, and Showers retaliated by stabbing Munson with a knife. In this circumstance, the admission of the video footage of the conversation between Showers and the officer constitutes harmless error because Showers made the same incriminating statements while talking to his relatives. Accordingly, this issue is without merit.
¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF LOWNDES COUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P.JJ., IRVING, BARNES, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. ISHEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, J.