# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01698-COA

**MICAH BOSTIC A/K/A DROP**                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                              **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/10/2017 |
| TRIAL JUDGE: | HON. PAUL S. FUNDERBURK |
| COURT FROM WHICH APPEALED: | ALCORN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ERIN ELIZABETH BRIGGS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD JOSEPH SCOTT HEMLEBEN |
| DISTRICT ATTORNEY: | J. TRENT KELLY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/18/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE J. WILSON, P.J., WESTBROOKS AND McDONALD, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Micah Bostic was convicted of capital murder in the Alcorn County Circuit Court and sentenced to a term of life imprisonment without eligibility for parole. Subsequently, Bostic filed a motion for a judgment of acquittal notwithstanding the verdict ("JNOV") and alternatively requested a new trial. The motion was denied. Bostic now appeals the issue of whether the circuit court erred in failing to suppress his statements made to the officers on February 3, 2016, which were obtained after he requested an attorney. Although we agree that the motion to suppress should have been granted because the officers violated his rights

against self-incrimination and his right to counsel, as guaranteed by the Fifth and Fourteenth Amendments,[1] we find that the court's decision resulted in harmless error and affirm the conviction.

## FACTS AND PROCEDURAL HISTORY

¶2.     On February 1, 2016, two men attempted to rob the Mapco service station in Corinth, Mississippi. When the clerk reached for the panic alarm one suspect shot her multiple times. Corinth Police responded to the Mapco service station's panic alarm at 5:39 a.m. The clerk later died from those wounds. When the detectives viewed the surveillance video, Brooklyn Traylor, the co-defendant, was identified as the shooter. The second suspect could not be identified from the Mapco surveillance video.

¶3.     When Traylor's parents learned that he was a suspect, they took him to the police station. Traylor denied his involvement in his first interview. On February 2, 2016, Traylor's parents watched the surveillance video and met with him privately. Then, Traylor gave another statement in which he admitted to committing the crime and stated Bostic, the appellant, also known as "Drop," was with him.

¶4.     On or about February 3, 2016, Bostic was arrested. During Bostic's interrogation, he clearly invoked his right to counsel when he stated, "I am taking my mother's advice, I want an attorney," but the officers continued questioning him. Bostic requested an attorney several times throughout the interrogation, yet the interrogation lasted nearly fifty-two

---

[1] The federal laws regarding the right against self-incrimination and the right to counsel during custodial interrogation generally apply to the States by incorporation through the due process clause of the Fourteenth Amendment to the federal Constitution. *Chamberlin v. State*, 989 So. 2d 320, 332 (¶35) (Miss. 2008).

minutes.

¶5.     A grand jury indicted Bostic and Traylor for capital murder with the underlying felony being armed robbery.  Bostic filed a motion to sever the cases, which the trial court granted.

¶6.     On January 19, 2017, Bostic filed a motion to suppress his statements made on or about February 3, 2016. Bostic argued that despite his multiple requests for an attorney, the investigators continued to interrogate him violating his constitutional right to an attorney.

¶7.     On February 7, 2017, the State filed its response to Bostic's motion to suppress.  The State argued Bostic's request for an attorney was vague.  The State contends the investigators immediately ceased the interrogation and did not ask any further questions regarding the charge at issue.  The State also contends the few words spoken by the investigator were not likely to elicit an incriminating response.

¶8.     After a hearing on the issue the circuit court denied Bostic's motion to suppress his statements made on February 3, 2016.  The court found that the statements made by Bostic to the detectives "were voluntarily, knowingly and intelligently made after being informed of his Miranda rights which he knowingly and voluntarily waived."[2]

¶9.     On October 3, 2017, a trial on the merits began. During the trial the State called fifteen witnesses.  Some of the witnesses testified to the logistics of the crime itself but the following witnesses' testimony pertained to Bostic's involvement.

¶10.    Captain Benjamin Gann testified that he found a loose distinctive patterned blue hoodie in a dumpster near the laundromat 75–100 yards away from the scene of the incident.

---

[2] See *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

Gann also testified that all of the garbage in the dumpster was bagged except for the distinctive patterned blue hoodie which fit the description of what the second suspect wore.

¶11.    During officer Jerry Rogers's testimony the State offered Bostic's videotaped interview into evidence.  The videotaped interview included details pertaining to Bostic's prior conviction for armed robbery, his whereabouts and alibi for the night before and morning of the incident, his affiliations with Traylor, and his prior gang affiliations with "gangster disciples."  Bostic never admitted to being at the scene where the victim in this case was murdered.

¶12.    Ashanti Alexander, who claimed to be Bostic's girlfriend during the time of the incident, testified that Bostic was known as "Drop."  Ashanti could not testify about Bostic's whereabouts on the night before the incident or during the time the incident occurred (sometime before 5:39 a.m.).  She could only testify that Bostic arrived at Elease Lavey Trice's apartment sometime before daylight on the morning the murder occurred.  Once Bostic arrived, she heard him tell Dezzon Thomas that Traylor shot someone seven times.[3] Ashanti stated that Bostic was wearing the distinctively patterned blue hoodie the day before the incident.  But he was not wearing a hoodie when she saw him after the occurrence of the murder.[4]

¶13.    Lavey, the owner of the apartment where Bostic, Traylor, and Dezzon were at some

---

[3] She stated that Bostic told her that he was not involved with the shooting.

[4] Bostic's attorney impeached Ashanti because in her video interview a few days after the incident she stated she did not know the last time she saw Bostic wearing the distinctive blue hoodie.

point before or after the incident, testified that Bostic was also known as "Drop." Lavey could not testify as to Bostic's whereabouts prior to the incident's occurrence. She testified that about 7 a.m. she woke up to Traylor beating on her back door and asking to speak to Bostic. Lavey further testified that Bostic was not at her home when she went to bed; therefore, someone must have let Bostic in while she was asleep.

¶14. Dezzon testified that he had heard people call Bostic "Drop." He contends he woke up to Bostic knocking on the front door of Lavey's apartment. He testified that Bostic told him that Traylor had just killed a woman at the store. Dezzon's testimony contradicted with Ashanti's testimony with respect to whether Bostic was at Lavey's house on the night before the murder. Dezzon's testimony also contradicted with Lavey's testimony regarding what time Lavey put him and Traylor out of her house.[5]

¶15. Kathryn Rodgers, the forensic DNA analyst, testified that she received the distinctively patterned blue hoodie and buccal swabs from Bostic in order for her to test whether Bostic's DNA was on the hoodie. She later received buccal swabs from Dezzon because Traylor implicated someone named "Wop" and Dezzon goes by that name of "Dewop." The results revealed an exclusion and likelihood ratio. In other words, the results express whether a person is excluded or cannot be excluded to the DNA mixture on the distinctive blue hoodie. Rodgers testified that 99.99 percent of all the people in the world were excluded as possible donors of the DNA profile. That left only .01 percent of the world

---

[5] Dezzon and Lavey's testimony contradicted as to the time that she got off work and the time she asked him and Traylor to leave. Dezzon testified that Lavey put them out around 10:30 to 11:00 p.m. He testified that Lavey incorrectly testified that she asked him and Traylor to leave between 3:30 and 4 a.m.

population's DNA profile that could possibly be contained in that swab. Bostic could not be excluded as a contributor of the DNA profile. However, Dezzon was excluded from being a contributor.

¶16.    Traylor testified that he never said Bostic was with him when he went into Mapco. Traylor stated that the officers wanted him to say Bostic was with him, but he contends that he only said "Drop" and that "Drop" and "Wop" are common names.[6] He stated that when he entered his plea he signed the statement on June 30 indicating that Bostic was with him at the time of the incident, but he did not look over the statement. As a result, Traylor did not agree with the statement he signed on June 30. Traylor testified that he did not know Bostic and never stated the name "Bostic" during any statement he made. To impeach Traylor, the State showed the video of his second interview in which Traylor confessed to the shooting. But during the interview Traylor stated that "Drop" was with him and that "Drop's" "government name" is "Micah Bostic." After watching the video of his interview, Traylor stated that he was under the influence and had just talked with his family, who told him those things about Bostic. Later, the State introduced the Mapco surveillance video. Traylor was heard using the name "Drop" in the Mapco surveillance video. In addition, the State attempted to elicit testimony regarding Traylor and Bostic's gang affiliation with the

---

        [6] Traylor referenced "Wop" during his testimony because during his third interview with the officers he attempted to retract his statement implicating Bostic. Traylor stated that the guy that was with him he went by the street name of "Wop." Traylor asserted he did not know the "Micah Bostic" that the officers arrested. Traylor gave the officers an address where "Wop" could be found. When the officer went to that address the owner stated that he did not know a "Micah Bostic" or "Wop." The owner stated that he knew Dezzon Thomas but his street name was "Dewop" as opposed to "Wop."

black gangster disciples.  Traylor did not confirm these facts.[7]

¶17.    To impeach Traylor, the State called Steven Wilburn, the jailhouse administrator, and offered letters (purporting to be from Traylor to Bostic) to prove that Traylor knew Bostic and that they were fellow gangsters affiliated with black gangster disciples.

¶18.    Bostic testified (against the advice of his counsel) that on Sunday, January 31, 2016, he was at Lavey's apartment at approximately 7 or 8 p.m.  Bostic testified that when he left, he went to Tunica with Alex Bostic (his little brother), Dominique Meriwether (his girlfriend), and Brian Rutherford (his cousin) around 8 p.m.  Bostic testified that they made it back to Corinth at approximately 2 a.m. and that he went to Brian's house to go to sleep.  He testified that Alex dropped him off at Lavey's at 6 a.m.  Bostic also testified that the last time he wore that blue hoodie was the Friday before the incident and that he left it in a pile at Lavey's apartment.

¶19.    At trial, Bostic insisted on calling his brother, Alex, as a witness against his attorney's advice (again).  Alex testified that on Sunday, January 31, 2016, when he, Bostic, Brian, and Dominique went to Tunica, they left Corinth at approximately 8 p.m.  Alex stated that they arrived back in Corinth at approximately 1 a.m. on Monday, February 1, 2016, and went to Country Lane Apartments. Alex contends he took Bostic to Lavey's apartment at approximately 7 a.m.[8]

¶20.    Following the week-long trial, the jury found Bostic guilty of capital murder on

---

[7] The State was trying to make a connection between Bostic and Traylor based on Bostic's statement that he was a former member of that gang.

[8] Upon cross-examination, Alex testified that Meriwether drove to Lavey's apartment.

October 10, 2017, and he was sentenced to serve a term of life imprisonment without parole pursuant to Mississippi Code Annotated section 97-3-21(3) (Rev. 2014).

¶21. Aggrieved, on October 18, 2017, Bostic filed a motion for a judgment notwithstanding the verdict and alternatively requested a new trial. The circuit court denied Bostic's requests on December 1, 2017. Despite having multiple issues in his motion, only the issue of the court's denial of his motion to suppress was raised on appeal.

¶22. Bostic timely noticed this appeal. Bostic alleges that the trial court erred by failing to suppress his statements given to the police investigators because he repeatedly invoked his constitutional right to counsel, and he says that the officers nonetheless failed to end the interrogation. Bostic also argues that his statements should be suppressed because the interrogation video shown during trial included a jailor questioning him about his gang affiliations.

**STANDARD OF REVIEW**

¶23. This Court will reverse a trial court's denial of a motion to suppress if the court's ruling was a manifest error or contrary to the overwhelming weight of the evidence. *Downey v. State*, 144 So. 3d 146, 150 (¶6) (Miss. 2014). "The standard of review for the suppression of evidence is abuse of discretion." *Chamberlin v. State*, 989 So. 2d 320, 336 (¶52) (Miss. 2008).

**DISCUSSION**

### I. Motion to suppress

¶24. The Fifth and Fourteenth Amendment prohibition against self-incrimination requires

8

that anyone subject to custodial interrogation be advised that they have the right to remain silent and the right to the presence of an attorney. *Balfour v. State*, 598 So. 2d 731, 744 (Miss. 1992) (citing *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). If the subject invokes the right to remain silent, then the questioning must stop; and if the subject requests counsel, the questioning must cease until an attorney is present. *Balfour*, 598 So. 2d at 744.

## II. Invocation of the right to an attorney

¶25. An individual must specifically invoke the right to counsel. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). The invocation does not have to be accomplished in a specific manner or at a specific stage in the process. *Holland v. State*, 587 So. 2d 848, 856 (Miss. 1991). Regardless of whether the defendant's request for an attorney is explicit or equivocal, the court must give a broad, rather than narrow, interpretation to a defendant's request for counsel. *Id*. at 856. In situations where the officer believes the accused made an equivocal statement suggesting a request for counsel, the interrogation may only continue on the narrow road to ascertain the meaning of the equivocal statement. *Id*.

¶26. In the present case the officer read Bostic his *Miranda* rights, and the following exchange occurred:

BY DETECTIVE ROGERS:

Q: Do you wish to talk to me about why you're here at this time?

A: Actually, I want to take my mother's advice cause she told me – I told her I'm innocent, so it ain't like me going in there and tell they ass what I want to. You know, but she told me to request for an attorney and you know I want to–

Q: Well I mean –

9

A:     I really want to, you know –

Q:     You're a grown man, so, you know, it's up to you. It's your decision to make.

A:     Yeah. I really want – I want to take my mother's advice, though, so–

Q:     So you're saying you want an attorney?

A:     Yes, sir.

Q:     (Detective Green) Micah I want you to understand you know everyone–[9]

A:     Actually, you know I had – I'm just now being released from prison like November 4th from doing eight mandatory years. Actually, that's what I had did at first. I had committed a crime with a guy from Tennessee and we robbed a cab driver. Okay. Well, I say we now cause I got incriminated for the shit and did the time for it. . . .[10]

¶27.   It is not required that a defendant use specific language, such as "I want a lawyer," to invoke the right to counsel. *Montoya v. Collins*, 955 F.2d 279 (5th Cir. 1992). *See also Downey v. State*, 144 So. 2d 146 (Miss. 2014) (finding Downy invoked her right to counsel by stating that she had an attorney and "could use him."); *Holland v. State*, 587 So. 2d 848, 856-57 (Miss. 1991) (holding that a suspect invoked his right to counsel when asking detectives "Don't you think I need a lawyer?"). Only "some kind of positive statement or other action that informs a reasonable person of the defendant's desire to deal with the police only through counsel" is required to assert the right. *Wilcher v. State*, 697 So. 2d 1087, 1096

_____

[9] Later, Detective Green finishes his sentence and says, "Well, that's what I want you to understand, Micah. You've been through this before."

[10] We use the language and style from the record presented to us and do not insert alterations regarding punctuation.

(Miss. 1997) (quoting *Michigan v. Jackson*, 475 U.S. 625 (1986)).

¶28. When Bostic stated that he wanted to take his mother's advice he invoked his right to counsel. The officers were required to cease the interrogation. The circuit court found that there was no police-initiated questioning after he invoked his right to counsel. When the circuit court denied Bostic's motion to suppress, it ruled that "[Bostic] stated he wanted an attorney, but in almost the same breath, without any questioning or prompting or prodding by the detectives, defendant starts voluntarily, freely and voluntarily [sic], relating to the detectives a story about his prior armed robbery of a cab driver and his sentence in that case." The circuit court also said, "in short, there was no interrogation by the police." We disagree.

¶29. This Court has held that an interrogation can exist even though an officer does not explicitly question one about the contents of the file or facts of the case. The "term interrogation has not been limited to encompass only express questioning by the police. In fact, the Mississippi Supreme Court has applied a broad interpretation to the term interrogation to include not only questioning, but rather questioning and its functional equivalent." *Pannell v. State*, 7 So. 3d 277, 282 (¶12) (Miss. Ct. App. 2008) (internal quotation marks omitted). The United States Supreme Court has defined "functional equivalent" to mean "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 282-83 (¶12) (citing *Rhode Island v. Innis*, 446 U.S. 291 (1980). "The determination of whether the police should have known a particular practice was reasonably likely to elicit an incriminating response focuses on the perceptions of the suspect, not the intent of the police." *Benjamin v. State*, 116 So.

11

3d 115, 122 (¶14) (Miss. 2013).

¶30. Here, the officers continued to question Bostic in a direct effort to get him to retract his invocation of his right to an attorney. The officers refused to accept Bostic's response that he wanted an attorney. Saying, "[Y]ou're a grown man, so it's up to you. It's your decision to make. . . ," was the functional equivalent of interrogation because the officer should have known that that was reasonably likely to elicit an incriminating response. Although the officer asked Bostic if he wanted and attorney and he responded "yes sir[,]" the interrogation still did not cease. Detective Green continued to try to get Bostic to talk when he stated, "Micah I want you to understand you know everyone." The officers made no indication that they honored Bostic's request. The camera did not stop running. Neither officer attempted to get up and escort Bostic out. The interrogation did not cease. "Once an accused has invoked his right to counsel, any statements given by the defendant in response to further police questioning are admissible only where (1) the defendant initiated further discussions with the police and (2) knowingly and intelligently waived the rights he had invoked." *Pannell*, 7 So. 3d at 287 (¶29) (citing *Smith v. Illinois*, 469 U.S. 91, 95 (1984)). Once the right to an attorney has attached, "any statements obtained from the accused during subsequent police-initiated custodial questioning regarding the charge at issue (even if the accused purports to waive his rights) are inadmissible." *Showers v. State*, 70 So. 3d 241, 247 (¶24) (Miss. Ct. App. 2011). Bostic neither initiated conversation with the officers nor did he waive his right to an attorney. This was a police-initiated questioning. Thus, we find that Bostic's statements were the product of further interrogation by the officers and should have

12

been suppressed because although he invoked his right to counsel the interrogation did not cease.

### III. Harmless error

¶31. The State argues that if this Court finds that Bostic's Fifth Amendment right to counsel was violated, it was harmless beyond a reasonable doubt. We agree.

> [T]he admission of statements taken in violation of an accused's Fifth Amendment rights is "amenable to harmless error analysis." "In order for a violation of a constitutional right to be held harmless, this Court must determine that the violation was harmless beyond a reasonable doubt." We have held that "errors involving a violation of an accused's constitutional rights may be deemed harmless beyond a reasonable doubt where the weight of the evidence against the accused is overwhelming."

*Hutto v. State*, 227 So. 3d 963, 980 (¶49) (Miss. 2017) (internal quotation marks and citations omitted).

¶32. We find that the admission of the video constituted harmless error beyond a reasonable doubt because Bostic's statements given to police were exculpatory and cumulative rather than inculpatory. During the interrogation, Bostic continuously pleaded and maintained his innocence. Bostic never confessed to any crime. During trial, Bostic testified to the same alibi as he did during his interrogation.

¶33. There was overwhelming evidence against Bostic without his statements. The surveillance video of the incident was played for the jury and the accomplice was referred to as "Drop." The State also introduced a video of Traylor's second interview which Traylor confessed that "Micah Bostic also known as Drop" was with him at the time of the murder. Although Traylor attempted to retract his confession implicating Bostic, letters purported to

13

be from Traylor to Bostic were entered into evidence. These letters revealed that Traylor planned to testify in Bostic's favor in an effort to "free [ ] Drop" because they could not "look out [] for each other [if] both [of them were] locked up." Several witnesses called by the State testified that Micah Bostic was known as "Drop." The physical evidence also supports the jury's verdict convicting Bostic. The distinctively patterned blue hoodie that the accomplice was seen wearing in the Mapco surveillance video was recovered from a dumpster near the scene of the incident. Ashanti testified that Bostic was wearing that distinctive blue hoodie before the incident occurred but he did not have it on when she saw him after the incident.[11] Rodgers, the forensic DNA analyst, testified that she received the distinctive blue hoodie and buccal swabs from Bostic. The DNA test she ran revealed the exclusion and likelihood ratio of potential contributors. The results provided that Bostic could not be excluded as a contributor of the DNA profile whereas 99.99 percent of all the people in the world were excluded as possible donors. Therefore, we conclude the evidence against Bostic was overwhelming rendering the Fifth Amendment violation harmless error.

**CONCLUSION**

¶34. The circuit court erred when it denied Bostic's motion to suppress his statements made during the February 3, 2016 interview. When Bostic invoked his right to counsel the officers did not cease the interrogation as required by law. However, we find the violation to be harmless error based on the overwhelming weight of the evidence against Bostic. Accordingly, we affirm.

---

[11] Bostic testified to the contrary.

14

¶35.   **AFFIRMED.**

**BARNES, C.J., GREENLEE, WESTBROOKS, TINDELL, LAWRENCE AND McCARTY, JJ., CONCUR. CARLTON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. J. WILSON, P.J., AND C. WILSON, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**